Mary T. LESTER, Plaintiff,

v.

Andrew NATSIOS, Administrator, Agency for International Development Defendant.

No. CIV.A.01–0233 JDB.

United States District Court, District of Columbia.

Oct. 7, 2003.

Steven Jeffrey Silverberg, Washington, DC, Counsel for Plaintiff.

Andrew David Auerbach, U.S. Department of Labor, Office of the Solicitor, Washington.

Beverly M. Russell, Jennifer U. Toth, Assistant United States Attorney, Office of the United States Attorney Washington, DC, for the District of Columbia, Special Proceedings Section.

## MEMORANDUM OPINION

BATES, District Judge.

In this action against defendant Andrew Natsios, Administrator, United States Agency for International Development (hereinafter "defendant" or "AID"), plaintiff Mary T. Lester ("plaintiff") asserts an exceptionally broad array of discrimination claims relating to her lengthy employment at AID. She includes claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794a, and she bases her claims on allegations of race, sex, age and handicap discrimination. Her litany of complaints includes failure to reasonably accommodate her handicap, denial of promotions, excessive job scrutiny and harassment, denial of training, unreasonable work assignments, inaccurate and delayed performance appraisals, exposure to a hostile work environment, and retaliation.

Faced with plaintiff's panoply of claims, defendant nonetheless has moved for summary judgment. The Court has carefully reviewed defendant's motion and plaintiff's responsive filings, and held a lengthy hearing. For the reasons explained below, defendant's motion is granted and judgment is entered in defendant's favor.

## BACKGROUND

During the period relevant to this action, and until her retirement on September 30, 1999, plaintiff was employed as an occupational safety and health specialist, GS–12, with AID. Plaintiff's primary complaints focus on the years 1993 and 1994, although not strictly limited to that period. Many of her allegations revolve around her supervision by William Miller and Lena Goodman, the Division Chief and Acting Chief, Property Management Division, during the relevant time. Among other things, plaintiff contends that AID failed to accommodate her handicap resulting from hypertension; that she was subjected to harassment, including the creation of a hostile work environment resulting from racially-motivated events in the workplace; that she received additional work assignments related to overseeing AID's safety and health concerns worldwide; that she was subjected to inappropriate supervision, including the requirement to submit a weekly calendar of her whereabouts; that she was denied a promotion to GS–13 in 1994 and 1995 (once because an advertised position was cancelled and later because a desk audit was adverse); and that several performance evaluations were improperly delayed or inaccurate as given.

Plaintiff's diverse claims under Title VII, the ADEA and the Rehabilitation Act are collected at several points in her First Amended Complaint ("Am. Compl."). At paragraph 56, she describes her series of complaints as follows:

a. Excessive job scrutiny/supervision and harassment, including being required as of February 8, 1994 to submit a weekly calendar detailing her whereabouts;

b. Being denied, beginning on February 16, 1994, an opportunity to com-

plete the WELP training program that would have enhanced her career potential;

c. Being subjected to an abusive, harassing meeting with her supervisor on February 16, 1994;

d. Being denied selection for a promotion to GS–13 in 1994 through the improper reannouncing and canceling of the GS–13 position for which she had applied;

e. Being harassed with unreasonable work assignment requests regarding her 1993–94 performance appraisal, and being given an inaccurate and unfair 1993–1994 performance appraisal in August 1994;

f. Being denied a promotion to GS–13 through an inaccurate Agency desk audit of her position performed in November 1994;

g. A hostile work environment and intense stress due to her workload being greatly increased in December 1994, and to the removal of necessary administrative help in December 1994;

h. Being denied a reasonable accommodation to her handicap, hypertension, by being denied reassignment, which she had first requested on September, 1994 and then continued to request;

i. Having her supervisor fail to prepare her 1994–95 performance appraisal;

j. Being given a late, unfair, and inaccurate 1994–95 performance appraisal in February 1996[.]

Am. Compl. ¶ 56; see also id. ¶¶ 59, 63, 67 and 78.

During this time, plaintiff asserts that she engaged in protected EEO activity, including filing a formal EEO complaint in 1989; filing an informal EEO complaint in 1993 regarding the appropriate reviewer for a performance appraisal; participating in a group letter dated October 1, 1993, to the then-AID Administrator alleging discrimination; participating in a class action EEO complaint filed on March 1, 1994; being interviewed by an EEO investigator on March 3, 1994, regarding a co-worker's EEO complaint; and filing formal EEO complaints relating to the assertions in this action in 1994 and 1995. See Am. Compl. ¶¶ 12, 77.

Following full discovery, defendant has moved for summary judgment as to each of plaintiff's claims in her Amended Complaint. In brief, defendant contends that there is no evidence whatsoever of sex or age discrimination, and that because plaintiff's hypertension (high blood pressure) was controlled by medication, plaintiff was not disabled within the meaning of the Rehabilitation Act and, in any event, AID attempted to find plaintiff an alternative position as reasonable, non-discriminatory accommodation before her condition was fully controlled by medication. As to plaintiff's promotion claims, defendant asserts that cancellation of the position she applied for defeats plaintiff's prima facie case of discrimination and that, in any event, the agency has provided a reasonable, non-discriminatory explanation for the cancellation. With respect to the failure to upgrade her position to a GS–13, defendant relies on the results of the AID desk audit as subsequently confirmed by another audit conducted by the Office of Personnel Management. Defendant then contends that under the controlling precedent in this Circuit, see Brown v. Brody, 199 F.3d 446 (D.C.Cir.1999), plaintiff's performance appraisal, training, work assignment, and excessive monitoring claims do not involve "adverse employment actions" giving rise to actionable discrimination claims. Plaintiff's hostile work environment claim, defendant contends, founded in part on her other discrimination claims as well as on three specific incidents, does

not rise to the severe and pervasive race-based offensive conduct that is required under the law. Finally, defendant contends that once plaintiff's discrimination claims are defeated for all these reasons, her retaliation claim must fail as well.

Plaintiff's response is generally to assert that she was mistreated over a several-year period in an agency environment where much discrimination towards African–American and female employees was occurring, and that given the smoke of such mistreatment, there must also be the fire of discrimination. Plaintiff urges that there are genuine issues of material fact on various points, and that her claims should all be allowed to go forward to trial and resolution by a jury. Although she has conceded that some claims are much weaker than others, and that for the most part she has no "smoking gun" to prove discrimination, plaintiff contends that her factual allegations are sufficient to defeat defendants' motion on all claims in the Amended Complaint.

*ANALYSIS*

Given the range of claims asserted by plaintiff, it is not easy to parse the Amended Complaint and the record to assess the viability of those claims in light of defendant's comprehensive motion for summary judgment. However, once the specific allegations are identified and independently

scrutinized under the prevailing law, it is apparent that plaintiff's claims cannot survive summary judgment. Plaintiff's disparate claims can best be analyzed under five distinct groupings: (1) Rehabilitation Act claims; (2) promotion claims; (3) miscellaneous claims relating to performance appraisals, training opportunities, assignments and monitoring; (4) hostile work environment claims; and (5) retaliation claims.[1] Before those claims are assessed, however, a brief discussion of the applicable analytical framework is warranted.

**I. *Analytical and Legal Framework***

**A. Summary Judgment Standard**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demon-

---

1. At the hearing on defendant's motion, plaintiff's counsel conceded that her gender and age discrimination claims were much weaker than her race and handicap claims. Certainly that is true. Plaintiff's gender claim, she concedes, is based solely on her subjective (and conclusory) feeling that men were treated better at AID, and her age claim is based on her subjective (and conclusory) belief that younger people in the office were treated better. Although she referenced at the hearing one man and two younger employees whom she believes received promotions in the relevant time period, none were to GS–13 positions

(the man was a manager and the others were secretaries); moreover, such isolated references, standing alone, could not be the basis for an inference of discrimination. The Court concludes, in light of plaintiff's concessions and the absence of any record evidence supporting her claims, that summary judgment on plaintiff's gender and age discrimination claims must be entered in favor of defendant. Neither claim can withstand analysis under the analytical framework discussed below in light of plaintiff's abject failure to produce anything more than conjecture to support her conclusory assertions.

strate the absence of a genuine issue of material fact." *Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

**B. The McDonnell Douglas Framework**

▮ The Court analyzes Lester's discrimination and retaliation claims based on race pursuant to the familiar burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff has the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. 1817; *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a prima facie case of discriminatory failure to promote, for example, a plaintiff must show that he is a

member of a protected class; that he applied and was qualified for the promotion at issue; that despite his qualification, he was rejected; and that, after his rejection, the position remained open and the employer continued to seek applicants who were no more qualified than plaintiff. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The prima facie case requirement was recently articulated by this Circuit as follows: "a plaintiff [must] state a prima facie claim of discrimination by establishing that: '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta,* 284 F.3d 135, 145 (D.C.Cir.2002) (quoting *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999)). To establish a prima facie case of retaliation, a plaintiff must show: "(1) that she engaged in statutorily protected activity, (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (quoting *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir. 1984)); *accord Brown v. Brody,* 199 F.3d at 452.

This Circuit's decision in *Brown v. Brody* examined whether, in a summary judgment context, certain alleged employment activities constituted adverse employment actions for a prima facie claim under Title VII. Building on earlier Circuit observations in private employment settings, the Court concluded that "federal employees like their private counterparts must show that they have suffered an adverse personnel action in order to establish a prima facie case under the *McDonnell Douglas* framework." 199 F.3d at 455. Under *McDonnell Douglas,* a common element of a prima facie case for both disparate treatment discrimination and retaliation is thus the requirement that plaintiff suffered

"some form of legally cognizable adverse action by the employer." *Id.* at 453 (citing *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448 n. 10 (11th Cir.1998)). This is so because under the provisions of Title VII "there must still be some kind of injury for [an] employee to state a claim," and thus "[an] employee must first be 'aggrieved' in order to bring an action." *Brown v. Brody*, 199 F.3d at 455.

■ If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The employer's burden, however, is merely one of production. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.*

■ If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Id.* (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097.

■ Although under *McDonnell Douglas* the "intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination, and at this point the *McDonnell Douglas* shifting burdens framework disappears, the sole remaining issue is discrimination *vel non*, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C.Cir.2003); *see Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances, including the strength of the prima facie case, any direct evidence of discrimination, and any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination). *See, e.g.,*

*Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097; *Lathram,* 336 F.3d at 1089; *Waterhouse v. District of Columbia,* 298 F.3d 989, 993 (D.C.Cir.2002); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1290 (D.C.Cir.1998).

## C. Hostile Work Environment

■■■■ To establish a prima facie hostile work environment claim, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment occurred because of her race or disability; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it. *See Jones v. Billington,* 12 F.Supp.2d 1, 11 (D.D.C.1997), *aff'd,* 1998 WL 389101 (D.C.Cir. June 30, 1998). However, the workplace environment becomes "hostile" for purposes of Title VII and legal relief only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *accord Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Clark County School District v. Breeden,* 532 U.S. 268, 270–271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Holbrook v. Reno,* 196 F.3d 255, 262 (D.C.Cir.1999).

■■■■ The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to an actionable hostile work environment. Under *Faragher v. Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), in order to determine whether a work environment is

sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Id.* at 787, 118 S.Ct. 2275 (citations omitted); *see also Breeden,* 532 U.S. at 271, 121 S.Ct. 1508 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient); *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1513 (D.C.Cir.1995).

■■■■ Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. As the Second Circuit has explained:

Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Thus, "to sustain a hostile work environment claim ... [plaintiff] must produce evidence that she was discriminated against because of her [status]." *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir.1999) (claim for

hostile work environment failed where only three of fifteen alleged incidents had racial overtones); *see also Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 605 (6th Cir. 2002) ("[A] racial or sexual hostile work environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's race or gender."); *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345–46 (7th Cir.1999) (hostile work environment claim failed where insufficient evidence that alleged harassing behavior were motivated by discrimination); *Jones v. Billington,* 12 F.Supp.2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior"); *Brady v. KBI Sec. Serv., Inc.,* 91 F.Supp.2d 504, 508–09 (E.D.N.Y.2000) (hostile work environment claim failed where alleged hostility was based on non-racial grounds); *Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 315 (S.D.N.Y.2000) (same).

### D. Rehabilitation Act

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show "(1) that [she] was an individual with a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Scarborough v. Natsios,* 190 F.Supp.2d 5, 19 (D.D.C.2002) (quoting *Rhoads v. FDIC,* 257 F.3d 373, 387 n. 11 (4th Cir.2001)).[2] An "individual with a disability" is one who has "a physical or mental impairment which substan-

tially limits one or more of such person's major life activities." *See* 29 U.S.C. § 705(20)(B); 29 C.F.R. § 1630.2(g) ("disability" is a "(1) physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment"). " 'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' " *Toyota v. Williams,* 534 U.S. 184, 196, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). "Substantially limits" is defined by regulation as: "(i) unable to perform a major life activity that the average person in the general population can perform or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). "Major life activities" are those "that are of central importance to daily life," *see Toyota,* 534 U.S. at 197, 122 S.Ct. 681, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Finally, factors that should be considered in determining whether an individual is substantially limited in a major life activity are (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *see Toyota,* 534 U.S. at 195, 122 S.Ct. 681.

To sustain a disability claim pursuant to the Rehabilitation Act, then, a

---

**2.** The Rehabilitation Act expressly incorporates the standards of the Americans with Disabilities Act for claims of employment discrimination. *See* 29 U.S.C. § 791(g).

**24**

plaintiff must as a threshold matter establish that he or she has a disability. *See Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir.2002); *Stein v. Ashcroft*, 284 F.3d 721, 724 (7th Cir.2002). Importantly, "merely having an impairment does not make one disabled." *Toyota*, 534 U.S. at 195, 122 S.Ct. 681. A claimant must instead demonstrate that the impairment *substantially* limits *a major life activity, see id.* (citation omitted), and is permanent or long-term, *see, e.g., McDonald v. Commonwealth of Pennsylvania*, 62 F.3d 92, 96 (3d Cir. 1995); *Paegle v. Dep't of the Interior*, 813 F.Supp. 61, 64 (D.D.C.1993).[3] In *Toyota*, the Supreme Court cautioned that "[i]t is insufficient for individuals attempting to prove disability status to merely submit evidence of a medical diagnosis of an impairment. Instead, the Act requires those 'claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience is substantial.'" 534 U.S. at 198, 122 S.Ct. 681 (citation omitted). Moreover, "mitigating measures" like medication and devices "must be taken into account in judging whether an individual possesses a disability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Sutton*, 527 U.S. at 488–489, 119 S.Ct. 2139. Hence, to succeed on a claim such as plaintiff raises here, one must prove, by a preponderance of the evidence, that she has a permanent (or long-term) impairment that substantially limits a major life activity, but that with a reasonable accommodation she can

perform the essential functions of the job.[4] *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C.Cir.1999); *Dorchy v. Washington Metro. Area Transit Authority*, 45 F.Supp.2d 5, 11, 13 (D.D.C.1999) (employee has burden of proving she can perform essential functions of job and proffering a reasonable accommodation to allow her to perform these functions); *Feliciano v. Rhode Island*, 160 F.3d 780, 786 (1st Cir. 1998) (plaintiff bears burden of showing existence of reasonable accommodation).

## II. Discussion

### A. Rehabilitation Act Claims

Plaintiff was employed at AID from 1986 until she retired in September 1999. She alleges that she was disabled (*i.e.*, was a qualified individual with a disability) because she suffered from high blood pressure (hypertension) that reached high levels in late 1994 before it was fully controlled by medication later in 1995. She contends that during the time when her blood pressure had reached high levels but was not yet under control through medication, she was a qualified person with a disability and was denied reasonable accommodation. The Supreme Court has unequivocally held that an individual suffering from hypertension whose high blood pressure is adequately controlled by medication is not disabled under the ADA (and hence under the Rehabilitation Act.) *See Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 518–19, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). Here, there is no

---

**3.** However, "[w]hile the presumption exists that temporary impairments do not qualify as disabilities ..., temporary conditions still require a case-by-case evaluation." *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 468 (4th Cir.2002) (citing *Toyota*, 534 U.S. at 198, 122 S.Ct. 681; *Sutton v. United Air Lines*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

**4.** Courts do not employ the *McDonnell Douglas* framework in evaluating a reasonable accommodation claim. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 860–861 (D.C.Cir. 1999); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994).

question that plaintiff's hypertension was sufficiently controlled by medication later in 1995, and indeed that she continued to work at AID until September 1999. The question, rather, is whether her hypertension for less than one year before it came under control through medication was enough to make her a qualified individual with a disability for that period.

■ The Court concludes that in light of *Murphy*, and applying the standards of *Toyota*, plaintiff does not satisfy the legal requirements to be a qualified individual with a disability. The temporary impairment from which plaintiff allegedly suffered, as reflected in the record, *see* Def. Mot. for Summ. J., Ex. 2, at 3, ¶ 2, is not enough in light of the need for permanent or long-term impact under the regulations and case law. *See, e.g.,* 29 C.F.R. § 1630.2(j)(2); *Toyota*, 534 U.S. at 195, 122 S.Ct. 681; *McDonald v. Commonwealth of Pennsylvania*, 62 F.3d at 96; *Paegle v. Dep't of the Interior*, 813 F.Supp. at 64. Plaintiff only suffered from uncontrolled hypertension for a discrete period, and then went back to work at AID for several years without relevant incident. Under *Toyota* and other cases, she cannot meet the definitional requirements for a qualified individual with a disability in light of the relatively short term of her impairment. As the Supreme Court has stated, "merely having an impairment does not make one disabled." *Toyota*, 534 U.S. at 195, 122 S.Ct. 681. Plaintiff cannot demonstrate that the temporary impairment from which she suffered substantially limited a major life activity. The relatively short duration of the impairment and the absence of any permanent or long-term impact from the impairment are factors that argue strongly against the conclusion that plaintiff's brief uncontrolled period of hypertension substantially limited a major

life activity. *See* 29 C.F.R. § 1630.2(j)(2); *Toyota*, 534 U.S. at 195, 122 S.Ct. 681.

Moreover, there is a serious question whether plaintiff experienced any limitation on a major life activity. She contends that her alleged inability to care for herself regarding the risks to her from hypertension represents a substantial limitation on a major life activity. The Court doubts that the ability to protect one's health from the very disease or disability at issue can amount to a recognized major life activity. Certainly, it is not as extensive as generally caring for oneself (e.g., eating, cleaning, etc.), and plaintiff does not assert she was limited in those tasks. Rather, health risks are a natural consequence of some illnesses, and dealing with those is not equivalent to major life activities of central importance to one's daily life (e.g., walking, seeing, hearing, working, etc.). Hence, for this reason as well, plaintiff has not established as a threshold matter that she is a qualified individual with a disability.

■ Finally, to succeed on her claim under the Rehabilitation Act, plaintiff must not only establish that she has a permanent impairment that substantially limits a major life activity, but that she can perform the essential functions of her job with reasonable accommodation. *See Flemmings v. Howard Univ.*, 198 F.3d at 861. With respect to reasonable accommodation, it is plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions. Plaintiff has offered no evidence that other positions were available that would reasonably accommodate her alleged disability. Defendant has produced evidence that a hiring freeze frustrated any ability to find other positions for plaintiff, *see* Def. Mot. for Summ. J., Exs. 5 and 6, and that defendant did make good faith attempts and even offered plaintiff a detail at the Department of State that she declined, *see*

*id.,* Ex. 6, Watkins Aff. ¶ 5. Plaintiff's proffer of the identity of one individual who received a transfer is not enough to place in dispute the showing by defendant that a hiring freeze made jobs generally unavailable, and hence that defendant was unable to find a less stressful position for plaintiff as a reasonable accommodation of her temporary hypertension condition. Hence, the Court concludes that plaintiff's Rehabilitation Act claim must fail for the additional reason that she has not satisfied her burden of establishing that other positions were available to reasonably accommodate her alleged disability.

## B. Promotion Claims

■ Plaintiff raises two claims regarding her non-promotion to a GS–13 position in AID. She argues that the agency's cancellation of the vacancy announcement for a GS–13 program analyst position for which she had applied reflects a manipulation of the system designed to preclude her from having the opportunity to compete. She also asserts that she was not promoted to GS–13 as the result of desk audits that were conducted on her GS–12 position, contending that the AID desk audit was discriminatory based on several flaws in the process. As plaintiff's articulation of her claims confirms, defendant has proffered legitimate, non-discriminatory explanations for the non-promotion of plaintiff to a GS–13 position—the cancellation of a vacancy announcement and desk audits that were completed by AID and the Office of Personnel Management. The issue, then, is whether plaintiff's challenges to those rationales raise an inference of discrimination based on the alleged falsity of defendant's proffered reasons for not promoting plaintiff.

Plaintiff does not dispute that the vacancy announcement for the GS–13 program analyst position was cancelled. That fact casts doubt on whether plaintiff has established a prima facie case of discrimination, because she has failed to demonstrate that the agency filled the position for which she applied. *See, · e.g., Morgan v. Federal Home Loan Mortgage Corp.,* 172 F.Supp.2d 98, 111 (D.D.C.2001). But in any event, defendant has convincingly explained that the vacancy was cancelled because the responsible manager wanted to recast the position differently, as to both its grade and functions. *See* Def. Mot. for Summ. J., Ex. 8. Plaintiff offers no rebuttal of this explanation, nor does she cast any doubt on its validity.

Instead, her only argument is that the record evidence on which defendant relies—primarily various e-mails—should be stricken as inadmissible hearsay. Plaintiff's argument is strictly procedural, as she provides no basis to challenge the trustworthiness of the evidence or, ultimately, the truthfulness of defendant's explanation for cancelling the vacancy announcement. Records of public agencies such as those challenged by plaintiff are generally admissible, the Court concludes, under Fed.R.Evid. 803(8), and should not be stricken here in any event.

Plaintiff fares no better in her challenges to the validity of the desk audits which are defendant's proffered explanation for plaintiff's failure to achieve promotion to the GS–13 level. The principal audit was conducted by AID and is the undisputed basis for defendant's decision not to reclassify plaintiff's position from a GS–12 to a GS–13. *See* Def. Mot. for Sum. J., Exs. 11 and 12, at p. 4. The desk audit focused on the duties actually being performed by plaintiff, and plaintiff's own responses to questions in large part established that she was not carrying out new job responsibilities sufficient to support an upgrade to GS–13. *See* Def. Mot. for Summ. J., Ex. 11(Manlian Aff. ¶¶ 6, 11).

Hence, even without any adverse comments from supervisors, the conclusion still was that plaintiff's position should not be classified as a GS–13. *Id.* ¶ 8.

The subsequent audit by OPM, although four years later, confirmed based on an extensive analysis of plaintiff's position that she was not even performing at the GS–12 level; therefore, a downgrade of plaintiff's position to GS–9 was recommended, although the agency did not implement that downgrade. *See* Def. Mot. for Summ. J., Ex. 12. Plaintiff makes no challenge to the independent conclusions in the OPM audit, which was conducted by experts in the field. Indeed, she offers no substantive challenge to the accuracy of either desk audit.[5]

Instead, plaintiff simply presents self-serving and conclusory arguments that incomplete information was furnished by her supervisors that compromised the audits. *See* Am. Compl. ¶¶ 92–93. Such unfounded challenges are not sufficient to raise genuine issues of material fact. Moreover, plaintiff's contention that a familial relationship between the AID auditor and someone in personnel with whom plaintiff had spoken is far from enough to cast legitimate doubt on the validity of the AID desk audit. Defendant has explained that there was no taint to the audit from that relationship, and plaintiff has certainly offered no evidence to conclude that the AID audit was compromised in any way. Again, plaintiff's conclusory allegations of discrimination are not enough. There is no real evidence of inaccurate or incomplete information being furnished by the agency as part of the audit process, and no evidence (or even logical likelihood) that the family relationship on which plaintiff

relies actually tainted the audit process. Under D.C. Circuit law, then, assessing the entirety of the relevant circumstances, this is a situation where plaintiff has presented a weak prima facie case, and very weak evidence that defendant's explanation for its actions is untrue, while on the other hand, there is abundant evidence of legitimate, non-discriminatory reasons for defendant's actions—all of which adds up to a failure by plaintiff to rebut the employer's explanation with sufficient evidence of pretext to allow an inference of unlawful discrimination. *See Lathram,* 336 F.3d at 1089; *Waterhouse,* 298 F.3d at 993; *Aka,* 156 F.3d at 1290.

### C. Miscellaneous Alleged Adverse Actions

 Plaintiff also raises claims of discrimination with respect to a series of other incidents or employment decisions that she believes can support a claim under Title VII. These include excessive scrutiny and supervision of her job performance (*e.g.*, having to submit a weekly calendar); denial of a training opportunity; exposure to an abusive meeting with her supervisor; unreasonable work assignments; and inaccurate, unfair, and delayed performance appraisals. *See* Am. Compl. ¶ 56. None of these allegations, however, amounts to an "adverse employment action" as required to establish a prima facie case in light of the D.C. Circuit's holding in *Brown v. Brody,* 199 F.3d 446 (D.C.Cir.1999), and subsequent cases. It is plaintiff's burden to establish, as part of her prima facie case, that the conduct on which she bases her claims constitutes adverse employment actions, and she has failed to meet that burden. Indeed, plaintiff's counsel effec-

---

5. The timing of the OPM audit, several years after the alleged discriminatory non-promotion of plaintiff, means it cannot be the *reason* plaintiff was not promoted to GS–13.

Rather, it is simply confirmation of the legitimate, non-discriminatory explanation based on the earlier AID desk audit.

28

tively conceded as much at the hearing on defendant's motion, calling *Brown v. Brody* a "huge problem" for plaintiff, and then attempting to argue around that controlling decision and to convince this Court that it is bad law. Plaintiff cannot succeed in that effort.

The Court of Appeals clarified in *Brown v. Brody* that employees must show that they have suffered an adverse employment action in order to establish a prima facie case, because under Title VII there must be an injury, and therefore "[a]n employee must first be 'aggrieved' in order to bring an action." 199 F.3d at 455. In determining whether a challenged action constitutes an adverse employment action, a court should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating," not intermediate decisions "having no immediate effect upon employment decisions." *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C.Cir.1997). Employer actions short of outright firing or non-selection for promotion can be adverse, but not all lesser actions count for purposes of Title VII liability. *See Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C.Cir.2002). Thus, " '[t]o establish an adverse personnel action in the absence of diminution in pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.' " *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.Cir.2002) (quoting *Brody*, 199 F.3d at 457) (decision of district court reprinted with endorsement from D.C. Circuit panel). Indeed, "[a]n 'employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage.' " *Id.* (quoting *Walker v. WMATA*, 102 F.Supp.2d 24, 29 (D.D.C.2000)); *see also Burlington Indus.,*

*Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Brody*, 199 F.3d at 457 (must show "objectively tangible harm"); *Raymond v. U.S. Capitol Police Bd.*, 157 F.Supp.2d 50, 56 (D.D.C.2001) (requiring tangible change in responsibilities or working conditions that results in a material employment disadvantage).

Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if "unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556–57 (D.C.Cir.1997). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). Purely subjective injuries, such as dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over assigned duties are not adverse actions. *See Forkkio*, 306 F.3d at 1130–31. Rather, there must be a significant change in job responsibilities. *See id.* at 1131 (where substantive job responsibilities are not reduced, there are no materially adverse consequences for Title VII liability).

The miscellaneous discrete incidents of which plaintiff complains do not involve the types of tangible harm that can support a discrimination (or retaliation) claim under Title VII. With respect to claims relating to allegedly inaccurate, unfair, or delayed performance appraisals, the D.C. Circuit has noted that formal criticism or poor performance evaluations are generally not adverse employment actions if they do not affect the employee's grade or salary. *See Brown*, 199 F.3d at 458; *see also Russell*

*v. Principi*, 257 F.3d 815, 819 (D.C.Cir. 2001) (negative performance evaluations are not adverse actions absent some effect on terms, conditions or privileges of employment); *Lewis v. Glickman*, No. Civ. A. 96–0358, 1997 WL 276084, * 6 (E.D.La. May 15, 1997) (late receipt of performance appraisal is "of no moment"). Performance evaluations are likely not to constitute adverse actions because the "result of the evaluation is often speculative, making it difficult to remedy. For example, a single poor evaluation may drastically limit an employee's chances for advancement, or it may be outweighed by later evaluations and be of no real consequence." *Russell*, 257 F.3d at 818.

■ Plaintiff did not receive negative evaluations, but rather only evaluations lower than she desired or containing what she believed were inaccurate observations. Although the evaluations were perhaps not all that she had hoped they would be, they were certainly not adverse in an "absolute sense." *See Brown*, 199 F.3d at 458 (overall "fully satisfactory rating" in middle of possible grades not adverse action under Title VII). In most circumstances "performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions." *Russell*, 257 F.3d at 819. Hence, plaintiff's claims of inaccurate, unfair or delayed performance appraisals do not constitute actionable adverse employment actions.

■ Likewise, the denial of a training opportunity alleged by plaintiff is not enough to sustain a discrimination claim, given that plaintiff has not explained adequately how the denial of the WELP train-

ing program affected some material change in her employment conditions, status or benefits. *See Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845 (D.C.Cir.2001); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir.1999). Even if the denial of training alleged by plaintiff could rise to the level of an adverse employment action, moreover, it is still plaintiff's burden to show that she was treated differently than her peers, and that such disparate treatment was based on her race or handicap. *See Freedman*, 255 F.3d at 844–45 (claim that plaintiff was denied intensive training given to other technicians failed where there was insufficient evidence to demonstrate that plaintiff was treated differently than his peers); *Richard v. Bell Atlantic Corp.*, 209 F.Supp.2d 23, 35 (D.D.C.2002) (claim for discrimination in training failed where plaintiff did not establish the existence of similarly situated white employees given training in lieu of her); *Richard v. Bell Atlantic Corp.*, 167 F.Supp.2d 34, 41 (D.D.C.2001) (plaintiff failed to make out a prima facie discriminatory denial-of-training claim where she did not identify any similarly situated employees of other races who were treated more favorably with regard to training). Plaintiff simply has not satisfied her burden.[6]

The "increased workloads" and undesirable work assignments of which plaintiff complains also do not rise to the level of adverse employment actions. She has not alleged or demonstrated any accompanying material decrease in her salary or change in her working conditions. Courts have recognized that increases in workload or changes in responsibility are not ad-

---

**6.** Plaintiff had completed all aspects of the WELP program except a 30–day detail, several efforts to schedule that detail were made, plaintiff could not undertake the approved detail in 1992 because of her surgery, and she was unable to complete the detail in 1994 because of overseas-related work assignments. *See* Lester Depo. pp. 141–42, 145–47, 152–56. An inference of discrimination could not reasonably be drawn from those facts.

verse employment actions, but rather constitute only the "ordinary tribulations of the workplace," which employees should expect. *See Mack v. Strauss,* 134 F.Supp.2d 103, 113 (D.D.C.2001), *aff'd,* 2001 WL 1286263 (D.C.Cir. September 28, 2001) (allegedly increased workload does not constitute actionable injury where not accompanied by adverse change in terms, conditions or privileges of employment); *Brodetski v. Duffey,* 141 F.Supp.2d 35, 45 (D.D.C.2001) (employees should expect to shoulder "extra load" on occasion); *Southard v. Texas Bd. of Crim'l Justice,* 114 F.3d 539, 555 (5th Cir.1997) (undesirable work assignments are not adverse employment actions); *MacLean v. City of St. Petersburg,* 194 F.Supp.2d 1290, 1299 (M.D.Fla.2002).[7]

Finally, plaintiff's claim based on unreasonable workplace monitoring, particularly having to submit a weekly calendar of activities, is insufficient. The record establishes that plaintiff was repeatedly out of the office, and that her supervisor's request to know of her whereabouts during work hours was reasonable. *See* Lester Depo. pp. 113–15, 209; Def. Mot. for Summ. J., Ex. 7 (Smith Aff. ¶ 10). But in any event, being closely supervised or "watched" does not constitute an adverse employment action that can support a claim under Title VII. *See, e.g., Chika v. Planning Research Corp.,* 179 F.Supp.2d 575, 587 (D.Md.2002) (allegations of close monitoring and repeated questioning about work fail to state a claim); *Boykins v. Lucent Technologies,* 78 F.Supp.2d 402, 414 (E.D.Pa.2000) (allegation of being "watched over" does not constitute an adverse action); *Flanagan–Uusitalo v. D.T. Industries, Inc.,* 190 F.Supp.2d 105, 117 (D.Mass.2001) (allegation of excessive scrutiny not enough to establish adverse action); *McCoy v. Macon Water Authority,* 966 F.Supp. 1209, 1221 (M.D.Ga.1997) (being watched and having to report to particular supervisor are not adverse employment actions). And to the extent such alleged monitoring of her performance can be seen as criticism, that too is not enough. *See Weigert v. Georgetown Univ.,* 120 F.Supp.2d 1, 17 (D.D.C.2000) ("Formal criticism and poor performance evaluations do not ordinarily constitute 'adverse actions.'"); *Brodetski,* 141 F.Supp.2d at 47 ("Criticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action.").

Plaintiff cannot pursue claims based on her myriad complaints about the workplace absent some evidence that she suffered tangible harm in terms of her salary, benefits, or working conditions. She has not done so, and her conclusory assertions that these incidents may have affected her potential for advancement or the working environment are not enough. Simply put, plaintiff has not carried her burden with respect to these miscellaneous alleged incidents of showing adverse employment actions for purposes of a prima facie case in light of *Brown v. Brody* and subsequent cases.

### D. Hostile Work Environment Claim

Plaintiff raises two distinct contentions in an attempt to support her hos-

---

7. Plaintiff's complaint of additional stress from her increased workload is not enough. The discrimination laws do not guarantee employees a stress-free work environment. *See Connors v. Chrysler Fin'l Corp.,* 160 F.3d 971, 976 (3d Cir.1998); *Wilder v. Southeastern Public Service Authority,* 869 F.Supp. 409, 418 n. 5 (E.D.Va.1994), *aff'd,* 69 F.3d 534 (4th Cir.1995). For this reason, plaintiff's complaint about exposure to an abusive meeting with a supervisor falls short of an actionable adverse employment action, particularly because plaintiff does not recall any discriminatory comments being made at the meeting. *See* Lester Depo. p. 186.

tile work environment claim. First, as stated in her First Amended Complaint, she relies on three incidents that occurred in the AID workplace: vandalism with respect to plants and coffee cans, a letter highly offensive to African–Americans, and an incident involving a supervisor in a Halloween costume. Am. Compl. ¶ 3. Second, and in response to defendant's contentions on summary judgment, plaintiff also now argues that the specific alleged incidents of discrimination she has raised collectively constitute a hostile work environment. Neither of plaintiff's themes can, the Court concludes, sustain a hostile work environment claim here.

Plaintiff relies initially on three unconnected incidents. The first involved vandalism in the form of slashing or cutting plants and coffee cans in the AID workplace environment. Apparently, this happened to several employees. Importantly, however, it did not happen to plaintiff, but only occurred in the general workplace around her. There is no evidence that this vandalism affected only women or only African–Americans, or was otherwise based on race. Defendant fully investigated the incident, but was unable to determine who was responsible.

The second incident on which plaintiff relies was both serious and reprehensible. A highly derogatory letter with a reference to the Ku Klux Klan was left on the desks of several African–American employees at AID. No one contests the seriousness of this incident and its potential as an indication of a hostile work environment. Two facts must be borne in mind, however. First, the agency again fully investigated the matter, but was unable to determine who was responsible. Moreover, like the vandalism, the conduct was not specifically directed at plaintiff (she was only shown the letter by another employee, it was not left on her desk), although there is no question that this incident had a patently racial thrust that would impact plaintiff as an African–American AID employee.

The third incident is best described as silly, although perhaps also somewhat offensive. It involved a supervisor who dressed up for a Halloween party in a costume as a plant, and then snipped scissors at plaintiff in a conference room. Whatever one thinks of the propriety of this conduct, there is no evidence of any discriminatory intent or any racial overtone. Importantly, the event was never made known to responsible AID officials, by plaintiff or anyone else, and hence the agency did not have the opportunity to investigate or address it.

The Court concludes that plaintiff cannot establish a prima facie case of hostile work environment based on these three incidents. The events simply are not, individually or collectively, sufficiently "severe" and "pervasive" to move beyond "the ordinary tribulations of the workplace" and "create an abusive working environment." *See Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275; *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Conduct directed at others rather than at plaintiff, such as the office vandalism, is less indicative of a hostile work environment. *See Gleason v. Mesirow Fin'l Inc.,* 118 F.3d 1134, 1144 (7th Cir.1997) ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). The vandalism and Halloween costume incidents may be insensitive, or even offensive, but they do not reflect the *extreme* conduct necessary to transform "the ordinary tribulations of the workplace" into a legally cognizable hostile work environment claim. *See Faragher,* 524 U.S. at 787–88, 118 S.Ct. 2275; *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir.1995). Moreover, there is no

evidence of any racial element to either event. The Supreme Court has instructed courts not to use the discrimination laws as a "general civility code," *see Faragher*, 524 U.S. at 787, 118 S.Ct. 2275, and these incidents as alleged by plaintiff are not enough to rise above the level of "merely offensive" into the category of a discriminatory, abusive, hostile work environment.

The same cannot be said of the Ku Klux Klan letter, which is plainly serious and extremely offensive. That is true even though it was not specifically directed to, or left on the desk of, plaintiff, because it is patently hostile to all AID African–American employees. But it is only a single offensive act, and hence may be "simply insufficiently severe to create an abusive working environment." *Glovinsky v. Cohen*, 983 F.Supp. 1, 3–4 (D.D.C.1997). A court must consider the frequency of any discriminatory conduct, and a workplace is "hostile" only when it is permeated with discriminatory intimidation, ridicule, and insult. *Oncale*, 523 U.S. at 81, 118 S.Ct. 998; *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275; *Harris*, 510 U.S. at 21, 114 S.Ct. 367; *see also Breeden*, 532 U.S. at 271, 121 S.Ct. 1508 (isolated incidents normally insufficient); *Neuren*, 43 F.3d at 1513. Standing alone, then, the single incident of this offensive letter is not enough to create a *pervasive* hostile work environment actionable under Title VII, notwithstanding its seriousness as an isolated event.

An important element of the analysis, moreover, is whether the employer knew of the alleged harassment and failed to take prompt and effective measures in response. *See Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002); *see also Faragher*, 524 U.S. at 806–07, 118 S.Ct. 2275. Here, the Ku Klux Klan letter and the vandalism were indisputably carefully investigated, albeit without success, by the agency. And the Hal-loween costume incident was not even known to the agency, largely because plaintiff chose not to report it, which is a further reason this incident does not provide a basis for finding a hostile work environment. *See Faragher*, 524 U.S. at 806–07, 118 S.Ct. 2275; *Woodland v. Joseph T. Ryerson & Son. Inc.*, 302 F.3d 839, 844 (8th Cir.2002) (noting that plaintiff failed to report incidents he alleged were part of a hostile work environment).

When the facts of these three incidents are fully taken into account, it is apparent that they cannot, individually or collectively, sustain a hostile work environment claim. The remaining question, then, is whether plaintiff can now support a hostile work environment claim by reference to her allegations of myriad specific discriminatory acts against her. The Court concludes that effort is also to no avail. To begin with, as discussed above, the Court concludes that plaintiff cannot sustain her claims of discrimination as to these alleged events, in large part because they were not adverse employment actions. Hence, they cannot satisfy the requirement that plaintiff show a pervasive, severe and *discriminatory* hostile work environment.

■ Moreover, it is not at all clear that mere reference to alleged disparate acts of discrimination against plaintiff can ever be transformed, without more, into a hostile work environment claim. The courts have been reluctant to do so. *See, e.g., Gardner v. Tripp County, South Dakota*, 66 F.Supp.2d 1094, 1100–01 (D.S.D.1998) (retaliation claims distinct from hostile work environment claim; "if the same set of facts could support both claims, state and federal provisions that provide a separate cause of action for retaliatory acts would be rendered superfluous"); *Parker v. State, Dep't of Public Safety*, 11 F.Supp.2d 467, 475 (D.Del.1998) ("... the dangers of allowing standard disparate treatment

claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address ...”). Discrete acts constituting discrimination or retaliation claims, therefore, are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Here, plaintiff's reliance on discrete acts that are neither severe and pervasive nor (as the Court has already concluded) discriminatory falls short of the showing she must make to state a viable hostile work environment claim.

## E. Retaliation Claim

Finally, plaintiff also asserts a retaliation claim under both Title VII and the Rehabilitation Act. *See* Am. Compl. ¶¶ 76–80. It is based on the same litany of complaints that forms the basis of her claims of race discrimination. *Compare* Am. Compl. ¶ 56 *with id.* ¶ 59 *and id.* ¶ 78. As such, therefore, plaintiff's retaliation claim fares no better than her discrimination claims.

■ To establish a prima facie case of retaliation, a plaintiff must show that she engaged in statutorily protected activity, the employer took an adverse personnel action, and there is a causal connection between the protected activity and the adverse personnel action. *See Brown v. Brody*, 199 F.3d at 452; *Mitchell v. Baldrige*, 759 F.2d at 86. If a prima facie case of retaliation is established, the claim proceeds through the *McDonnell Douglas* analytical framework, ultimately to whether the defendant has presented a legitimate

non-discriminatory reason for its actions and whether plaintiff has rebutted that explanation with a showing that it is a pretext for discrimination.

■ Plaintiff alleges that she engaged in several instances of protected EEO activity. The statutorily protected activity she alleges includes filing a formal EEO complaint in 1989, filing an informal EEO complaint in 1993, participating in a group letter dated October 1, 1993, to the then-Administrator of AID alleging discrimination, participating in a class action EEO complaint filed on March 1, 1994, being interviewed by an EEO investigator on March 3, 1994, regarding a co-worker's complaint, and filing formal EEO complaints relating to the assertions in this action in 1994 and 1995. *See* Am. Compl. ¶¶ 12, 77.

Here, reading the Amended Complaint broadly, plaintiff complains of four types of alleged retaliatory actions by defendant: (1) the miscellaneous alleged discriminatory conduct discussed above at pp. 20–25, *see* Am. Compl. ¶ 78a–c, e, g, j–k; (2) her non-promotion to GS–13 discussed above at pp. 17–19; *see* Am. Compl. ¶ 78d & f; (3) the denial of a reasonable accommodation for her alleged handicap (hypertension), discussed above at pp. 14–17, *see* Am. Compl. ¶ 78h; and (4) allegedly negative comments on a compensation claim form, *see* Am. Compl. ¶ 78i. None of these myriad complaints can sustain a retaliation claim.

The Court has considered whether any of the miscellaneous discriminatory conduct alleged by plaintiff amounts to an adverse employment action. In Part II. C of this Memorandum Opinion at pp. 27–30 *supra*, the Court has unequivocally concluded that none of these events involves the type of tangible harm needed to establish an adverse employment action under

the law. Hence, plaintiff cannot satisfy her burden of establishing a prima facie case of retaliation based on these events.

The Court has also concluded that defendant has provided a legitimate, non-discriminatory explanation for plaintiff's non-promotion, which plaintiff has not rebutted with evidence of pretext sufficient to permit an inference of unlawful discrimination. *See* Part II. B, pp. 26–27, *supra*. That conclusion defeats plaintiff's retaliation claim based on her non-promotion as well. Likewise, the Court's conclusion that plaintiff's Rehabilitation Act claim fails because she was not a qualified individual with a disability and because she has not met her burden of establishing that other positions were available to reasonably accommodate her alleged disability, *see* Part II. A, pp. 24–26, *supra*, defeats her retaliation claim based on that same alleged denial of reasonable accommodation.

Lastly, plaintiff's claim of retaliation based on negative comments a supervisor placed on her Occupational Disease and Claim Compensation Form in 1994, *see* Am. Compl. ¶ 78i, is insufficient. Plaintiff cannot show that the supervisor's comments were provided to the Department of Labor with any retaliatory intent. Although her disability claim was denied, it was on the basis of her failure to establish a work-related claim based on an emotional condition, disability, or associated physical condition. *See* Def. Mot. for Summ. J., Ex. 15 at 6. But the contested statement by the supervisor was related to plaintiff's work hours and scope of duties. *Id.* Hence, the causal link between the supervisor's statement and the reason the Department of Labor denied her claim is far too attenuated to support a retaliation claim.

To the extent, then, that plaintiff's retaliation claim depends upon her non-promotion and other race discrimination alle-

gations, or the alleged denial of reasonable accommodation for her hypertension, the retaliation claim must fail along with those underlying claims. The Court concludes, therefore, that defendant is entitled to summary judgment on plaintiff's retaliation claim as well.

### *CONCLUSION*

For all the foregoing reasons, plaintiff's diverse discrimination, hostile work environment, and retaliation claims under Title VII and the Rehabilitation Act cannot succeed. Accordingly, defendant's motion for summary judgment will be granted in its entirety. A separate order has already been issued.