Savitri SINGH, Plaintiff,

v.

**UNITED STATES HOUSE OF REP-
RESENTATIVES, COMMITTEE ON
WAYS AND MEANS, Defendant.**

No. CIV.A. 02–0522(RMC).

United States District Court,
District of Columbia.

Jan. 22, 2004.

Woodley B. Osborne, Osborne & Deutsch, Washington, DC, for Plaintiff.

Gloria Lett Ferguson, Victoria L. Botvin, U.S. House of Representatives, Office of House Employment Counsel, Washington, DC, for Defendant.

### MEMORANDUM OPINION

COLLYER, District Judge.

Savitri Singh sues the Committee on Ways and Means of the United States House of Representatives ("Committee") for race, color, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and the Congressional Accountability Act of 1995, 2 U.S.C. § 1301 ("CAA"). She alleges hostile work environment, salary discrimination, and discriminatory discharge. At the close of discovery, the Committee filed a motion for summary judgment, which Ms. Singh opposes. For the following reasons, the Court will grant the motion and dismiss the complaint.

## I. BACKGROUND

### A. Facts

Ms. Singh is of Indian origin. She was born in British Guyana and emigrated to the United States when she was 18 years old; she is now a citizen of this country. Ms. Singh has a master's degree in endocrinology and biochemistry from Howard University and, in 1987, she received her law degree from Georgetown University Law Center. Thereafter, she worked in private practice as a staff attorney at Gibson, Dunn & Crutcher LLP and as an attorney/advisor for the United States Customs Service before becoming a professional staff member on the Subcommittee on Trade ("Subcommittee") in October 1998.

During the hiring process for the Subcommittee position, Angela Ellard, Ms. Singh's soon-to-be immediate supervisor, purportedly received several negative references from Ms. Singh's former employers.[1] *See* Def.'s Mot. for Summ. J. ("Def.'s

---

1. During Ms. Singh's job interview, Pete Singleton, the Committee's chief of staff at the time, told Ms. Singh that someone had described her as "aggressive and difficult to get along with[.]" Def.'s Mot. Exh. 1 (Pl.Dep.) at 131. Mr. Singleton advised Ms. Singh that "the Committee [is] small and that they [don't] have room for aggressiveness." *Id.*

Mot.") Exh. 3. Notes from Ms. Ellard indicate that Ms. Singh's last supervisor at the United States Customs Service reported that Ms. Singh "pisses people off left and right" and "doesn't want to listen to other people." *Id.* Exh. 4. In addition, Ms. Singh's former supervisor at Gibson, Dunn & Crutcher LLP apparently stated that Ms. Singh left that job over a "quality of work issue." *Id.* Despite these references, Ms. Singh obtained employment with the Subcommittee because Congressman Phil Crane (R–IL), chairman of the Subcommittee, strongly recommended her. *See* Pl.'s Opp. at 2 (acknowledging that Ms. Singh "was hired on the recommendation of Philip Crane, a member of Congress and Chair of the Trade Subcommittee, over the objections of the Staff Director of the Trade Subcommittee, Angela Ellard, and the Ways and Means Committee's Chief of Staff, Pete Singleton"). Ms. Singh was the only non-Caucasian on the professional staff of the Committee during the time of the Republican majority prior to her discharge. *See* Pl.'s Opp. Exh. 11. Like all Committee staff, she was an at-will employee without an employment contract. *See* Def.'s Mot. Exh. 1 at 83–84. Ms. Singh's starting salary was $60,000 per year; at the time of her termination, she earned $62,000 per year.

Ms. Singh alleges that, upon her arrival at the Subcommittee, she "immediately experienced Ms. Ellard as hostile and unreceptive." Pl.'s Opp. at 6. She further asserts that Committee staff subjected her to hostile and discriminatory treatment throughout the course of her employment, including "mocking her ability to speak English, frequently abusing, berating and degrading her, excluding her from meetings, unfair evaluation of her work, unfair demands, denying travel opportunities, and a variety of other measures designed to diminish her stature and stifle her professional growth." Compl. ¶ 6.

In January 2001, the chairmanship of the full Committee changed when Congressman Bill Archer (R–TX) retired and Congressman Bill Thomas (R–CA) succeeded him as chairman. Congressman Thomas had been the third-ranking member in seniority on the Committee, behind Congressman Crane, and some "political tension" was created on the Committee when the normal seniority rules were ignored and Congressman Thomas was made chairman. *See* Def.'s Mot. Exh. 9 (Kelliher Dep.) at 65. The new chairman hired Allison Giles as chief of staff and John Kelliher as chief counsel for the Committee in February 2001. While Ms. Giles was the primary decision-maker for personnel issues, she was assisted by Mr. Kelliher, Otto Wolff (who had worked for Congressman Thomas for a number of years), and Bob Winters (who had worked for Congressman Thomas for approximately 20 years in his personal office). *See id.* at 15–18. This group reviewed the personnel working for the Republican majority on the Committee and its various subcommittees. According to Mr. Kelliher, "[T]here's a period at the turn of a Congress, and particularly with a new chairman, where people are leaving simply for any variety of reasons . . . . So there was some of that churning that had to be dealt with. And we reviewed the staff and what they did and made some personnel decisions." *Id.* at 15. A number of people who had worked for Congressman Archer "understood that there was a change in the regime and . . . they went out and found themselves other employment, and so it never came to termination." *Id.* at 29.

As a result of the review of Committee procedures and staffing, three staff members were terminated involuntarily: Timothy Hanford, Michael Superata and Ms.

Singh.[2] Messrs. Kelliher and Wolff met with each of these employees and "just simply stated that [they] were reevaluating the Committee's structure and personnel, and that [they] didn't see a role" for that individual. *Id.* at 73–74; *see also* Def.'s Mot. Exh. 1 (Pl.'s Dep.) at 205 ("They told me I was being terminated, and it had nothing to do with my work, that—I believe they used the words that I didn't fit in with the new Committee ...."). As part of this process, Mr. Kelliher developed the impression that there were conflicts between Ms. Singh and Ms. Ellard over work-related issues.[3] *See* Def.'s Mot. Exh. 9 at 102. However, the group evaluating Committee employees did not consult with Ms. Ellard about Ms. Singh's performance "because the transition was a delicate time with respect to all employees and there was no certainty any one supervisor would continue employment." Def.'s Mot. Exh. 10 (Kelliher Aff.) ¶ 5. Input on Ms. Singh's performance was received from Mr. Winters and Chris Smith, the Committee's former deputy chief of staff. Mr. Kelliher explained:

> I had been told that [Ms. Singh] had a connection or allegiance to Congressman Crane. Chairman Thomas had ascended to the Chairmanship past Congressman Crane ... bypassing the traditional emphasis on seniority. As a result, I believed that [Ms. Singh's] association with Congressman Crane could nega-

tively affect the efficient functioning of the Committee.

> Another reason for the termination decision was [Ms. Singh's] poor reputation and unsatisfactory job performance. Winters had worked with [Ms. Singh] and indicated that [she] did not have a good professional reputation, that she had limited substantive experience, and that she had problems getting along with others. I was also informed that several individuals complained about [Ms. Singh's] performance.

> These were the factors I had in my mind when I concurred in the decision to terminate [Ms. Singh's] employment.

*Id.* ¶¶ 12–14; *see also* Def.'s Mot. Exh. 11 (Giles Aff.). At the time Ms. Giles and Mr. Kelliher reached these personnel decisions, each had been working for the Committee for only about two weeks. *See id.* ¶ 12. Ms. Singh was officially discharged from her position on the Subcommittee on February 12, 2001.

## B. Statutory Framework

Once immune from suit for employment-related claims, Congress adopted the CAA to put itself voluntarily under the jurisdiction of the federal courts to resolve employment discrimination (and other) disputes if an administrative resolution process, which includes counseling and mediation, fails.[4] The CAA incorporates

---

**2.** Eight individuals were selected for termination, including Ms. Singh, after all employees submitted a resume and were interviewed by Mr. Wolff. "All eight employees were identified for termination for the same general reasons as [Ms. Singh]: performance problems and political incompatibility." Def.'s Mot. Exh. 10 (Kelliher Affidavit) ¶ 9. Five of the eight voluntarily moved on because of the change in leadership. *See id.* ¶ 15. Except for Ms. Singh, all of the selected individuals were Caucasian.

**3.** The Committee contends that Ms. Singh demonstrated repeated performance problems during her tenure with the Subcommittee. She allegedly had continual problems with her writing and demonstrated a poor attitude, behavior and judgment. *See* Def.'s Mot. Exhs. 2, 3, 6, 7, 8. In response, Ms. Singh asserts that Ms. Ellard was "hostile, patronizing and frequently abusive" and that her own work product was good. Pl.'s Opp. at 2; *see also id.* Exhs. 1 (Pl.'s Aff.), 8 (Wassell Aff.).

**4.** Section 1404, 2 U.S.C. § 1404, states:

parts of Title VII and requires that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on ... race, color, religion, sex, or national origin[.]"[5] *Id.* § 1311(a). Due to the inherent political nature of Capitol Hill, the CAA specifically allows an employing office to consider an employee's party affiliation, domicile, or political compatibility in making employment-related decisions. 2 U.S.C. § 1432(a).

It is uncontested that the CAA applies to Ms. Singh as a "covered employee" in the legislative branch. 2 U.S.C. §§ 1301(3)(A), 1301(9)(B). Moreover, she appears to have fulfilled her statutory obligation to exhaust administrative remedies prior to filing suit on March 18, 2002.[6] Remedies under the CAA include, as appropriate, back pay, reinstatement, and compensatory—but not punitive—damages. 2 U.S.C. §§ 1311(b)(1)(A) and (B).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This procedural device is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

In employment discrimination cases under Title VII—in the absence of direct evidence of discrimination—courts generally apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination. If successful, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its conduct. "If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez,* — U.S. —, 124 S.Ct. 513, 517, 157 L.Ed.2d 357 (2003); *see also*

---

5. The Committee notes that "the Office of Compliance Summary, created in conjunction with the CAA, suggests that claims brought under Section 1311 of the CAA are subject to the requirements and standards set forth in court decisions interpreting Title VII." Def.'s Mot. at 12 n. 2. Both parties cite cases involving Title VII in making their arguments.

6. On January 19, 2002, Ms. Singh received a right-to-sue letter dated December 18, 2001. Compl. ¶ 4.

Not later than 90 days after a covered employee receives notice of the end of the period of mediation, but no sooner than 30 days after receipt of such notification, such covered employee may either—(1) file a complaint with the Office [of Compliance] ... or (2) file a civil action ... in the United States district court for the district in which the employee is employed or for the District of Columbia.

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### III. ANALYSIS

Ms. Singh advances three claims against the Committee for (1) hostile work environment, (2) discriminatory pay disparity, and (3) discriminatory termination. The complaint identifies three Committee employees as essentially responsible for this alleged mistreatment of Ms. Singh: Ms. Ellard, Mr. Smith, and Mr. Singleton. The Committee moves for summary judgment in its favor on each claim, analyzed separately below.

### A. Hostile Work Environment

■ As an initial matter, the Court notes that Ms. Singh did not respond in her opposition brief to the Committee's arguments with respect to her claim of hostile work environment. Given the brevity of Ms. Singh's complaint, the Court is therefore not entirely certain about the exact nature of this claim, *i.e.,* what specific facts support her allegation that she was subjected to a hostile work environment. "The court's role is not to act as an advocate for the plaintiff and construct legal arguments on [her] behalf in order to counter those in" a motion for summary judgment. *Stephenson v. Cox,* 223 F.Supp.2d 119, 122 (D.D.C.2002). Nonetheless, the Court will not dismiss this claim as conceded, as the Committee requests. *See Burke v. Gould,* 286 F.3d 513, 518 (D.C.Cir.2002) ("[I]n view of the severity of dismissal of a potentially meritorious claim ... treating an issue as conceded for failure to respond fully to a motion for summary judgment 'should only be applied to egregious conduct.'"). The Court instead will use the excerpts from Ms. Singh's deposition and her affidavit as guidance for determining what facts underpin her hostile work environment claim.

When decided on the basis of her own statements, this claim must be dismissed.

■ Ms. Singh's allegations of a hostile work environment center on Ms. Ellard's purported conduct. Ms. Singh characterizes her immediate supervisor as "hostile, patronizing and frequently abusive[.]" Pl.'s Opp. at 2; *see also* Def.'s Mot. Exh. 1 at 159 ("She just treated me in a condescending patronizing manner."). According to Ms. Singh, Ms. Ellard "froze Ms. Singh out of important meetings and humiliated her at those meetings she did attend." Pl.'s Opp. at 2–3. Furthermore, at a meeting behind closed doors in Ms. Ellard's office, Ms. Ellard allegedly "started off about how terrible things were and all the things I was doing wrong" and, when Ms. Singh asked to be excused to attend a hearing, Ms. Ellard allegedly told her "to shut up and sit down." Def.'s Mot. Exh. 1 at 101–02. Ms. Singh also testified about a second event when Ms. Ellard "called [Ms. Singh] into her office and asked—she was screaming, you know, what was that all about" because Ms. Singh had left the office due to pain from an out-of-work injury and failed to answer a phone call from Ms. Ellard. *Id.* at 124. Ms. Singh's affidavit cites additional examples of alleged mistreatment, such as not being assigned a parking space, having difficulty obtaining supplies, being treated "as if [she] were invisible" by Ms. Ellard, *i.e.,* she was purportedly overlooked at staff meetings, denied work in areas of her expertise, isolated from other staff members, excluded from high-level meetings, denied opportunities for professional growth, and denied the opportunity to attend the ten-day festivities surrounding her daughter's college graduation because she was released only for the immediate days surrounding the graduation itself. *See* Pl.'s Opp. Exh. 1 ¶ 15. In summary, Ms. Singh argues that Ms. Ellard was

"constantly hostile and hypercritical, kept [Ms. Singh] out of important meetings, interrupted the flow of her work to interpose critical editing, credited all complaints against Ms. Singh, and ignored all praise." Pl.'s Opp. at 6.

As to Ms. Ellard's motivation for allegedly behaving in this manner, Ms. Singh states, "I believe very firmly in my mind that Angela did not want an ethnic person in a Subcommittee job of that level." Def.'s Mot. Exh. 1 at 119; *see also id.* at 121 ("Q[:] Is it possible that she didn't want you in that job? A[:] No, I don't—no. I don't believe that at all.... I think that it was because she didn't want a minority like me in that job."). To support this belief, Ms. Singh asserts simply that she "was treated very differently [from other employees], and [she] was treated very unfairly." *Id.* at 122.

In her deposition, Ms. Singh described Mr. Singleton's alleged role in the hostile work environment:

I had very limited interaction with Pete Singleton, and ... all the occasions that I can remember, he was unfriendly to me.

I remember making gestures toward Pete Singleton, whether it was in the hallway or cafeteria line and places like that, and he would not even, you know, acknowledge me. I remember once when he had a heart condition and I ran—saw him in the basement near the cafeteria [and] I ran to catch up with him to tell him I was sorry, he brushed me off.

Def.'s Mot. Exh. 1 at 174–75. As with Ms. Ellard, Ms. Singh acknowledged that her only basis for believing that Mr. Singleton's alleged conduct towards her was based on her race, color, or national origin was that she was treated differently and that she was the only non-Caucasian pro-

fessional staff member on the Committee. *Id.* at 175.

With respect to Mr. Smith's contribution to the alleged hostile work environment, Ms. Singh stated during her deposition:

I didn't have that much contact with Chris Smith. I went to him sometimes for work because I found that he was very knowledgable [*sic*] and helpful....

I was at a meeting Angela had asked me to go to. I sent Chris Smith several e-mails that I would be at this meeting asking—it was in the Capitol. There were representatives of many agencies there.

There was someone from the Leadership Office there, and I got there before Chris. When he walked in—and in front of everybody in the office he looked at me and said what are you doing here. It was humiliating. Chris Smith is not the kind of person who goes around humiliating people like that....

Q [D]o you believe that statement was based on your race, color, or national origin?

A I don't know whether that statement was based on that.

Def.'s Mot. Exh. 1 at 182–83.

In her affidavit, Ms. Singh averred that Ms. Ellard, Mr. Singleton and Mr. Smith "generally denied" her the opportunity to travel to customs ports and excluded her from all Congressional Delegation trips. *See* Pl.'s Opp. ¶¶ 13–14. These three individuals are also alleged to have refused Ms. Singh the opportunity to give speeches. *See id.* ¶ 22.

■ A hostile work environment exists only "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' " *Harris*

*v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). This standard is designed to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. In addition, "it must be clear that the hostile work environment was the result of discrimination based on a protected status ... '[o]therwise, the federal courts will become a court of personnel appeals.'" *Lester v. Natsios*, 290 F.Supp.2d 11, 22 (D.D.C.2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir.2002)).

The Court finds that Ms. Singh's allegations fail to rise to the level of a hostile work environment. On this record, it appears without doubt that Ms. Singh had a rocky working relationship with Ms. Ellard. Neither the frequency nor the content of the interactions that Ms. Singh describes with Ms. Ellard, Mr. Singleton, or Mr. Smith, however, amounts to severe and pervasive treatment sufficient to alter the conditions of her employment. Mr. Singleton's and Mr. Smith's alleged conduct clearly falls well below this standard, especially in light of Ms. Singh's admittedly limited interaction with these men. Failing to acknowledge someone in the hallway and simply asking someone why she is attending a meeting in front of others (although perhaps embarrassing) hardly give rise to an abusive working environment for purposes of Title VII. *See Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C.Cir.1999).

Ms. Singh's allegations against Ms. Ellard, although more numerous, are similarly deficient and do not establish a hostile work environment, even when combined with her colleagues' alleged actions. These allegations generally fall into three categories: (1) Ms. Ellard's criticism of her work; (2) Ms. Ellard's manner of addressing her; and (3) the nature of the work assignments and opportunities afforded to Ms. Singh. Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting, especially where, as here, the work environment is particularly pressurized and employees are operating within severe time constraints on matters of national import. Assuming that events transpired as described by Ms. Singh, they do not demonstrate a work environment that was pervaded by discrimination. *See Richard v. Bell Atlantic Corp.*, 209 F.Supp.2d 23, 35 (D.D.C.2002) ("'[T]he type of conduct that [Ms.] Walton complains of, i.e., rude comments, unjust criticism, and stressful working conditions, amount to "ordinary tribulations of the workplace" that [is] insufficient as a matter of law for a hostile environment case.'"); *see also Brodetski v. Duffey*, 141 F.Supp.2d 35, 48–49 (D.D.C.2001). Working for a Congressional committee, especially the high-profile Committee on Ways and Means, can be very demanding and stressful; some staff members accordingly may be curt or even rude to others. The fact that Ms. Singh may have been shut out of certain meetings, denied travel opportunities and other perks, and spoken to in a condescend-

ing manner, although perhaps disrespectful and unfair, also does not mean that Ms. Singh was subjected to an illegal hostile work environment.

■ In addition, there is insufficient evidence for a reasonable jury to conclude that any unpleasantness between Ms. Singh and her fellow Committee members stemmed from Ms. Singh's race, national origin, or color. None of the actions allegedly committed by Ms. Ellard, Mr. Singleton, or Mr. Smith had any racial overtones, except perhaps for Ms. Singh's contention that Ms. Ellard spoke to her as if she did not understand English well. Ms. Singh concedes that no one on the Committee ever made any negative statements relating to her, or anyone else's, race, color, or national origin. *See* Def.'s Mot Exh. 1 at 158–59. She also never heard anything that she would consider a racial slur. *See id.* at 160. The mere fact that Ms. Singh was the sole non-Caucasian on the Committee staff does not, without something more, suffice to make the necessary causal connection between Ms. Singh's race, color, and national origin and the alleged mistreatment. *See Bryant v. Brownlee,* 265 F.Supp.2d 52, 65–66 (D.D.C.2003) ("In the absence of some greater indicator of race or age bias, the uniqueness of plaintiff's race and age in her workplace cannot substantiate a claim that plaintiff's workplace was 'permeated with discriminatory intimidation, ridicule, and insult.'") (citing *Neilley v. State Farm Ins. Cos.,* 202 F.3d 269, 1999 WL 1281717, at *5–6 (6th Cir. Dec.29, 1999) (unpublished)).

Because Ms. Singh has not advanced facts that are severe or pervasive enough to alter the conditions of her employment and create an abusive working environment, and she has not produced the requisite evidence connecting the alleged mistreatment to her race, national origin, or color, summary judgment will be granted to the Committee on this count and this hostile work environment claim will be dismissed.

## B. Discriminatory Discharge

■ Ms. Singh challenges the Committee's termination of her employment, arguing that she was fired because of her race, national origin, and/or color. Under the first step of the *McDonnell Douglas* burden-shifting scheme, Ms. Singh must demonstrate that her termination occurred "under circumstances which give rise to an inference of discrimination." *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (internal quotation marks omitted) (emphasis omitted). Ordinarily, a plaintiff may establish a *prima facie* case of discriminatory discharge by showing "(1) membership in a protected class, *i.e.,* that she is [an ethnic minority], (2) performance at or near the employer's legitimate expectations, (3) discharge, and (4) replacement by a person of equal or lesser ability who is not a member of a protected class or, alternatively, the position remains open after termination." *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1512 (D.C.Cir.1995); *see also Dang v. Inn at Foggy Bottom,* 85 F.Supp.2d 39, 43 (D.D.C.2000). The Committee concedes that Ms. Singh is a member of a protected class and that she was discharged, but disputes that she "performed [her] duties to [her] employer's satisfaction" and that she was "replaced by someone with similar qualifications but who falls outside of the protected class." *Kalekiristos v. CTF Hotel Mgmt. Corp.,* 958 F.Supp. 641, 668 (D.D.C.1997).

With respect to the issue of Ms. Singh's job performance, the Court finds that there is sufficient evidence to satisfy the second element of the *prima facie* case. A genuine dispute exists over whether Ms.

Singh performed her duties at or near the Committee's legitimate expectations. Although the Committee presents solid evidence Ms. Singh's written work was "poorly drafted" and required heavy editing, *see* Def.'s Reply at 9, Ms. Singh has cast sufficient doubt on that assertion for purposes of summary judgment. She attached to her affidavit several "thank you" letters from lobbyists with whom she came in contact while working with the Subcommittee, as well as letters of recommendation from Members of Congress, which were written after she had been terminated. *See* Pl.'s Opp. Exh. 1. Other individuals submitted affidavits attesting to Ms. Singh's writing ability and good demeanor. *See* Def.'s Reply at 9 ("Plaintiff supports her 'evidence' of being competent, reliable, an excellent writer, and easy to get along with,' [*sic*] through the affidavits of Phillip Crane, Arlene Crane, Stuart Seidel, Clint Tarkoe, Timothy Wineland, and Susan Wassell."). From this, a reasonable jury could conclude that Ms. Singh did in fact perform at a level that at least met the Committee's standards. *See Carney v. American Univ.*, 151 F.3d 1090, 1093 (D.C.Cir.1998) ("[T]o survive summary judgment the plaintiff need only raise a genuine issue of material fact with respect to each element of the *McDonnell Douglas* framework.").

Ms. Singh has also adduced enough evidence to fulfill the fourth element of the *prima facie* case. The Committee argues that David Kavanaugh, a Caucasian, did not "replace" Ms. Singh. According to the Committee, although both persons have held the same title (along with other Subcommittee staff), Ms. Singh's job duties were almost exclusively directed toward customs issues while Mr. Kavanaugh also works "on agriculture, World Trade Organization negotiations, Africa issues, textile matters, European Union trade issues, China trade issues, appropriations, Japan trade issues, and services issues." Def.'s Mot. Exh. 3 ¶ 23; *see also id.* ¶¶ 24, 34. The Committee further contends that Mr. Kavanaugh has superior qualifications to Ms. Singh. Mr. Kavanaugh had worked directly with the new chairman of the Committee, Congressman Thomas, from 1997 to 2001, allowing him to reflect better the new leadership priorities. Nonetheless, Mr. Kavanaugh's job includes many of Ms. Singh's responsibilities for customs issues. The Court finds that this comparison is too fact-driven and contested to be determined on a motion for summary judgment.

■ Fatal to Ms. Singh's allegations of discriminatory discharge, however, is the fact that the decision to terminate her was made by Ms. Giles and Mr. Kelliher, who had known Ms. Singh for only two weeks and whose affidavits provide, as Ms. Singh acknowledges, legitimate, nondiscriminatory reasons for her termination. *See* Pl.'s Opp. at 9 (conceding that "[the Committee] has met its burden of adducing evidence in support of non-discriminatory reasons for its decision to terminate [Ms. Singh].""). The major explanation for Ms. Singh's discharge, her political incompatibility, is recognized as a sound basis for employment decisions under the CAA. 2 U.S.C. § 1432. Once the defendant demonstrates a legitimate, nondiscriminatory reason for the termination, the presumption of discrimination created by the establishment of a *prima facie* case "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Despite Ms. Singh's acknowledgment that the Committee has met its burden of production in this regard, she now argues that the assertion of political incompatibility was a pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine,*

450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("[Plaintiff] may succeed in [convincing the court that she was the victim of intentional discrimination] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). Ms. Singh contends that two other members of the Subcommittee's professional staff, Meredith Broadbent and Donna Thiessen, were "more closely aligned with [Congressman] Crane[,]" were Caucasian, and were not discharged. Pl.'s Opp. at 10. The premise of this argument, however, is faulty. Ms. Broadbent never worked for Congressman Crane personally, but she did have sixteen years of service with the Committee before Ms. Singh arrived. *See* Def.'s Reply at 7; Def.'s Mot. Exh. 16. While *Mrs.* Crane may have developed a close relationship with Ms. Broadbent, as argued by Ms. Singh, this does not demonstrate any meaningful connection between Ms. Broadbent and the Congressman. Ms. Singh also argues that Ms. Thiessen, who had previously worked in Congressman Crane's personal office, was not terminated. Ms. Thiessen resigned from the Committee and is not comparable. Ms. Thiessen had forecast her impending resignation to Ms. Giles in February so that Ms. Giles knew that Ms. Thiessen would not be working under the new Committee leadership and that she would soon be leaving voluntarily. *See* Def.'s Reply Exh. 2 (2nd Giles Aff.) ¶¶ 3–4. For this reason, there was no need to discharge Ms. Thiessen involuntarily. The comparisons used by Ms. Singh therefore do not refute the Committee's evidence that it relied upon Ms. Singh's political incompatibility—a legitimate, nondiscriminatory reason—as a major factor in making its termination decision.

Ms. Singh also challenges Ms. Giles and Mr. Kelliher's belief that Ms. Singh had a poor reputation and unsatisfactory job performance. *See* Def.'s Mot. Exhs. 9, 10, 11. Ms. Singh disputes these conclusions with her own affidavit and affidavits from individuals, including Congressman and Mrs. Crane, who did not supervise Ms. Singh or work closely enough with her to review her unedited written work at the Committee. These differences of opinion are neither surprising nor pertinent; Ms. Singh's response to the Committee's evidence is insufficient to show pretext or to defeat summary judgment. The critical issue here is not whether Ms. Singh's work product was actually deficient, but whether Ms. Giles and Mr. Kelliher, the Committee's decision-makers on personnel issues, were of that opinion when they terminated her. There is no evidence that they were not. Notably, Mr. Kelliher attested that he and Ms. Giles did not consult with Ms. Singh's immediate supervisor, Ms. Ellard, the person whom Ms. Singh asserts harbored "hostility toward her[,]" in reaching their decision. Pl.'s Opp. at 13.

To prevail on her claim of discriminatory discharge, Ms. Singh "must show *both* that the [Committee's reasons were] false, *and* that discrimination was the real reason . . . . [I]t is not enough to *dis*believe the employer . . . *there must be a finding of discrimination*." *St. Mary's Honor Ctr.*, 509 U.S. at 511 n. 4, 113 S.Ct. 2742 (internal quotation marks omitted) (emphasis in original). With no basis to discredit the Committee's legitimate, nondiscriminatory reasons for terminating Ms. Singh's employment, much less a basis to infer that discrimination was a motivating factor, the Court concludes that no reasonable jury could render judgment in favor of her on this count. Accordingly, Ms. Singh's allegations concerning discriminatory discharge will be dismissed.

## C. Salary Discrimination

 "To establish a prima facie case [of salary discrimination], [Ms. Singh] must show by a preponderance of the evidence membership in a protected class . . . and 'that [she was] performing work substantially equal to that of [Caucasian employees] who were compensated at [ ] higher rates than [she was.]' " *Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271 (D.C.Cir.1998) (internal citations and quotation marks omitted). Ms. Singh, a lawyer of Indian descent, was hired by the Committee at a salary of $60,000 per year and was making $62,000 when she left the Committee approximately two years later. She asserts that the disparity between her pay and that of others on the Committee "is nothing short of shocking." Pl.'s Opp. at 18. Ms. Singh identifies the "most logical comparators" to herself as Chris Carey, Jeffrey McMillen, Payson Peabody, Kimberly Reed, and Brigen Winters. *Id.* at 19. According to Ms. Singh, Mr. Carey was hired in 1999 at an annual salary of $78,000 as a professional staff member on the Subcommittee on Health; Mr. McMillen was hired in 1998 at an annual salary of $75,000 as a professional staff member on the Subcommittee on Oversight; Mr. Peabody was hired in 2001 at an annual salary of $90,000 as a professional staff member on the Subcommittee on Oversight; Ms. Reed was hired in 2001 at an annual salary of $90,000 as a professional staff member on the Subcommittee on Oversight; and Ms. Winters was hired in 1999 at an annual salary of $76,000 as tax counsel. The Committee objects to these comparisons on the grounds that these individuals have different backgrounds and expertise, and that they all work for different subcommittees with the exception of Ms. Winters, who is tax counsel and not even a member of the professional staff. It argues that Ms. Singh was similarly situated only to the two other professional staff members on her own subcommittee, Mses. Broadbent and Thiessen.

The Court agrees with the Committee that the individuals identified by Ms. Singh were not similarly situated to her for the purpose of equating salaries; the Committee offers permissible grounds for treating them differently.[7] Mr. Carey had nearly seven years of prior Capitol Hill experience in three different legislative offices, had a different expertise (health care), and was hired to work on a different subcommittee. Unlike Ms. Singh, Mr. McMillen, Mr. Peabody, and Ms. Winters possess advanced degrees in taxation and therefore must be paid more to compete with the private sector.[8] *See* Def.'s Mot. Exh. 9 at 43. Ms. Winters, moreover, is a certified public accountant. Mr. Peabody and Ms. Reed were hired after Ms. Singh had left the Committee and different people determined their salaries based on the criteria and priorities of the Subcommittee on Oversight. *See generally Forman v. Small*, 271 F.3d 285, 293 (D.C.Cir.2001). Ms. Reed also had approximately four years of prior Capitol Hill experience.

Ms. Singh does not present viable evidence to rebut these distinctions. She pri-

---

7. Ms. Singh's arguments are based on the starting salaries of Committee staffers, *see* Pl.'s Opp. at 18–20 ("[T]he salaries we are looking at now were set at the outset of employment."); therefore, the Court relies on this same data point for its comparisons.

8. The Court notes that Mr. McMillen received his LLM in taxation from Georgetown University Law Center in February 2000, after he joined the professional staff on the Subcommittee on Oversight. Nonetheless, it appears that Mr. McMillen had developed his tax expertise beforehand; from January 1996 to June 1998, he was tax counsel and director of tax policy for the American Electronics Association. *See* Pl.'s Opp. Exh. 18.

marily focuses on one difference in background, her lack of Capitol Hill experience, arguing that Caucasians with no such experience "were hired by the Committee at salaries $15,000 higher than Ms. Singh." Pl.'s Opp. at 20. However, the three individuals with no prior legislative experience—Mr. McMillen, Mr. Peabody, and Ms. Winters—commanded higher pay due to their specialization in tax law, a point that Ms. Singh does not refute.

 With respect to Ms. Singh's fellow professional staff members on the Subcommittee on Trade—the individuals who are comparable to Ms. Singh for salary purposes—the Court finds that there was no meaningful disparity in pay under the circumstances, certainly not enough from which to infer discriminatory animus on the part of the Committee. Ms. Thiessen, hired by the Committee in August 1999, had eight years of prior legislative experience while Ms. Singh, hired in October 1999, had none. Even so, Ms. Thiessen's starting salary was $62,500, just $2,500 more than Ms. Singh's annual wages. Ms. Broadbent also had prior legislative experience when she began working for the Subcommittee in 1995; she had worked for the Committee since 1982. Her salary upon joining the Subcommittee was $60,000 per year, the same as Ms. Singh's starting pay. These comparisons do not support a claim of discrimination in wages; therefore, Ms. Singh's claim of salary discrimination based on race, national origin, and color will be dismissed.[9]

## IV. CONCLUSION

The Committee's motion for summary judgment will be granted and the com-

plaint will be dismissed. A separate order accompanies this memorandum opinion.

### *ORDER*

For the reasons stated in the Memorandum Opinion that accompanies this Order, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. It is **FURTHER ORDERED** that the Complaint is **DISMISSED**.

**SO ORDERED.**

---

**9.** It is noteworthy that Steve Whitaker, the Caucasian male whom Ms. Singh replaced on the Subcommittee, had worked for the Committee for three years and was earning $63,200, or $3,200 more than Ms. Singh's starting salary, when he left the Committee. *See* Pl.'s Opp. Exh. 11, at 16.