Tommy J. WINSTON, Plaintiff,

v.

G. Wayne CLOUGH, Secretary, Smithsonian Institute, Defendant.

Civil Action No. 07-CV-1411 (BJR)

United States District Court, District of Columbia.

Signed May 17, 2013

Sundeep Hora, Alderman, Devorsetz & Hora PLLC, Washington, DC, for Plaintiff.

Alexander Daniel Shoaibi, Charlotte A. Abel, U.S. Attorney's Office, Washington, DC, for Defendant.

## ORDER GRANTING SUMMARY JUDGMENT

Barbara Jacobs Rothstein, United States District Court Judge

### I. INTRODUCTION

Plaintiff, Tommy J. Winston ("Plaintiff" or "Winston"), an employee of the Smithsonian Institution ("Defendant" or "Smithsonian") filed a complaint against the Secretary of the Smithsonian, seeking damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 200 *et seq.*, ("Title VII") for discrimination, retaliation, and hostile work environment. (Dkt. No. 7, Amended Complaint ("Am. Comp.") at ¶¶ 45-53). The Smithsonian moves for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 36 ("Mot.")). Plaintiff opposes the Motion. (Dkt. No. 39 ("Opp.").

For the reasons discussed below, the Court concludes that Plaintiff has failed to raise a genuine issue of material fact regarding whether the disciplinary action the Smithsonian imposed on Plaintiff was motivated by discriminatory or retaliatory animus. Plaintiff also failed to raise a genuine issue of material fact with respect to his hostile work environment claim. Accordingly, the Court grants summary judgment to the Smithsonian on each of Plaintiff's claims.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts, except where noted, are not in dispute:

Winston, an African-American, is a Facilities Management Specialist at the Smithsonian. (Am. Comp. ¶ 1). He has been employed with the Smithsonian since 1995 and is currently employed at the GS-13 level. (*Id.* at ¶¶ 1, 21). Beginning in January 2006, Winston was a Zone Maintenance Manager in the East Mall Zone. (Plaintiff's Ex. 10 at 2). However, on January 14, 2006, Winston was temporarily moved to the Suitland Maryland Zone ("the Suitland Zone"), following a meeting with one of his colleagues, Kendra Gastright, on January 13. (Def.'s Ex. 27, 158-161). Both parties describe the meeting as confrontational. (Pl.'s Ex. 10; Plaintiff's Statement of Additional Material Facts ("PSAMF") ¶ 33). Winston's direct supervisor, David Samec, instructed him to stay away from the East Mall Zone, and on February 7, 2006, Samec issued a Pro-

posed One-Day Suspension to Winston based on the events of the January 13 meeting.[1] (Def.'s Ex. 37 at 1; Def.'s Ex. 32). Winston's second-line supervisor, Nancy Bechtol, the Manager for the Office of Facilities Management ("OFM"), met with Winston to discuss the proposed suspension. (Am. Comp. at ¶ 28). After meeting with Winston, Bechtol reduced the proposal to a Confirmation of Counseling, reminding Winston of his duty to interact with all employees in a "professional and courteous manner." (Def.'s Ex. 34). Bechtol did not address Winston's temporary transfer to the Suitland Zone. (Id.).

Ultimately, the Smithsonian permanently reassigned Winston to the Suitland Zone. (Def.'s Ex. 27 at 126:1-22). Defendant claims that this was a "win-win" situation because Winston "had repeatedly asked" to be "transferred to the Suitland Zone." (Id. at 199:7-14). Winston, however, alleges that he was unhappy with the transfer. He claims that between January 2006 and May 2006, he was assigned to a small 9x6 office and his work responsibilities were greatly diminished. (Pl.'s Ex. 1 at 157:1-17; Pl.'s Ex. 27).

On May 9, 2006, Winston was reassigned to a GS-1640 position as the Acting Building Manager for the Suitland Zone. (Pl.'s Ex. 32). Defendant alleges that Winston applied and interviewed for the promotion, and was elected to the position effective August 6, 2006. (Defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("DSMF") at ¶ 8). Winston argues that although he was "promoted" to this position, the Smithsonian treated the promotion as a "reassignment," thereby downgrading his future promotion potential. (PSMAF at ¶¶ 94, 96). Both parties

agree that Bechtol was the selecting official.

On June 26, 2006, Winston filed an Equal Employment Opportunity ("EEO") complaint alleging that the Smithsonian discriminated against him on the basis of race and color when it transferred him to the Suitland Zone. (Am. Comp. at ¶ 6.). The Smithsonian dismissed Winston's complaint as untimely on August 1, 2006. (Id. at ¶ 7). Winston appealed the decision to the Equal Employment Opportunity Commission ("EEOC") on September 22, 2006. (Id. at ¶ 8). The EEOC affirmed the Smithsonian's decision. (Id. at ¶ 9).

Thereafter, in August 2006, Winston received a time off award and a cash award. (DSMF at ¶¶ 7, 9). In October 2006, Bechtol approved Winston's request to travel to an industry conference. (Id. at ¶ 11). In addition, Winston received a positive performance appraisal on January 31, 2007, which Bechtol approved. (Id. at 10).

After Winston transferred to the Suitland Zone, his direct supervisor was Maurice Evans, who is also African-American. (DSMF at ¶¶ 12, 16). On February 6, 2007, Winston attended a weekly managers meeting that was also attended by, among others, Evans and David Sidbury, the Assistant Building Manager. (Am. Comp. ¶ 32). Winston is Sidbury's direct supervisor. (Def.'s Ex. 21 at 2). A key topic during the meeting was the snow storm that was forecast for the next day. Id. Both parties agree that Evans placed Sidbury in charge of making sure that the snow was cleared from the premises in the morning. (Id.; Pl.'s Ex. 36). Sidbury informed Evans that he planned to have another employee, Oscar Waters, come in to help with the snow removal. (Pl.'s Ex. 39 at 2). Evans object-

---

1. Generally, the direct supervisor issues a Proposal to Suspend in which s/he sets forth why s/he thinks a suspension is warranted. The employee then has an opportunity to re-spond to the proposal. The Deciding Official, here, Winston's second-line supervisor Nancy Bechtol, decides whether the suspension is appropriate.

ed, stating that the Smithsonian did not want Waters to help with the snow removal because Waters is a Wage Grade, Level 10 ("WG-10") employee and the Smithsonian did not want to pay overtime for a WG-10 employee. (Pl.'s Ex. 6 at 63:14-64:6). When Sidbury expressed concern that Waters might be upset by this, Winston told Sidbury not to worry, that he would "take the hit." (Pl.'s Ex. 37 at 1-2). By saying that he would "take the hit," Sidbury assumed that Winston meant that he "would be responsible for [Waters] not coming in for snow removal." (*Id.*). Winston denies that he told Sidbury he would "take the hit." (Pl.'s Ex. 37, Addendum). The Smithsonian claims that although Evans placed Sidbury in charge of the snow removal procedures, it was Winston's responsibility, as Sidbury's direct supervisor, to make sure that Sidbury followed Evans' instructions. (Def.'s Ex. 21).

Later that evening, Sidbury called Evans to tell him that if Waters came in the next day to help, he would not send him home. (Pl.'s Ex. 39 at 3). According to Sidbury, Evans consented, stating that it "was not [Sidbury's] job to tell [Waters] not to come in; that it was [Winston's] job to tell him that because [Winston] was [Water's] supervisor." (*Id.*). The next day, February 7, it snowed as predicted and Waters came in and worked on snow removal as he usually did. (*Id.*). Waters claims that Sidbury called and asked him to come in after two other employees failed to show. (Pl.'s Ex. 40 at 2). Later that day, Evans called to find out if Waters had come in, which Sidbury confirmed. (*Id.*). That same day, Evans began to draft a Proposed Suspension for Winston, based on the fact that Winston failed to make sure that Waters did not work the snow removal. (Def.'s Ex. 10).

Later that same day, Gastright notified Nancy Bechtol that Winston had used ap-

proximately 2,000 minutes on his work-issued cell phone in the prior month. (Pl.'s Ex. 47). Bechtol instructed Evans to look into whether Winston was using an excessive amount of cell phone minutes for personal phone calls. (*Id.*). Evans discovered that Winston had used 2,109 and 2,223 minutes during the prior two billing cycles. (Def.'s Ex. 43 at 16, 21). The Smithsonian Cellular Telephone and Blackberry policy ("Cellular Policy"), effective May 17, 2006, allowed Smithsonian employees to make "occasional and incidental" personal cell phone calls. (Def.'s Ex. 17 §§ 2, 7 (B)). The Cellular Policy also referred to the Smithsonian's Code of Conduct, Smithsonian Directive 103, which permits only "incidental and occasional personal use" of Smithsonian computer and communications systems. (*Id.*; Def.'s Ex. 20 § 12(a)).

On February 28, 2007, Evans issued to Winston a Proposal to Suspend for Seven Days. (Pl.'s Ex. 50). The proposal was based on the February 7 snow removal incident and Winston's cell phone usage. (*Id.*). Thereafter, Winston's lawyer submitted a letter to Bechtol, in which he advocated against the proposed suspension. (Def.'s Ex. 23). Winston raised the following defenses: (1) he was not in charge of snow removal on February 7, (2) it was Sidbury's decision, not his, to call Waters in to work that day, (3) Waters had been called in for other snow removals since February 7; (4) other Smithsonian employees had abused their cell phone privileges without being disciplined; and (5) the Smithsonian's cell phone policy had not yet been fully developed and should not be applied retroactively. (*Id.*). After receiving the letter from Winston's attorney, Bechtol investigated the defenses that Winston raised, but found them unconvincing. (Def.'s Ex. 25). She recommended the seven-day suspension to Melanie Engelen in OFM's Human Resources Department ("HR"), but stated that she would leave it

up to HR to decide whether Winston's actions warranted a seven day suspension. (*Id.*). However, she specifically requested that Winston receive "some sort of suspension" because he "has got to stop defying orders." (*Id.*).

Thereafter, on April 24, 2007, the Smithsonian issued to Winston a Decision to Suspend for Seven Days. (Am. Comp. ¶ 43; Def.'s Ex. 21). In the Decision, Bechtol stated:

> The issue in this proposal is that you, as Building Manager, did not follow a direct order given on February 6 by your supervisor, Maurice Evans, to make certain Mr. Waters did not report to snow duty the morning of the 7th. As Building Manager, you have subordinate supervisors who work for you, and they provide direction to their staff. Your task was to make sure that [Mr. Sidbury], your subordinate, did not call Mr. Waters in to work on snow removal on February 7. By not doing this, you disregarded a specific work direction by your supervisor, and the [Smithsonian] paid more for snow removal, by paying overtime for an additional WG-10, than was necessary as a result of this error. I do not approve of your shifting the blame for your lack of following direct orders to your subordinate supervisor.

(*Id.* at 3). Bechtol also stated that she did not find it persuasive that Waters had been called in to work other snow removals after February 7. "Every snow storm is different, and each storm is staffed differently depending on the severity of the storm predicted. You cannot compare the staffing requirements for snow removal on February [7]" to that required during other storms. (*Id.*).

As for the cell phone usage, Bechtol found that Winston violated the Smithsoni-

an's cell phone policy, stating: "[y]our Nextel invoices clearly indicate excessive personal use, with some calls ranging from 50 to 137 minutes. You admitted to your supervisor that it was possible that some of the calls were not for official [Smithsonian] business." (*Id.*). Bechtol concluded: "I believe the seriousness of your failure to follow instructions regarding snow removal and your violation of the Smithsonian Cellular Telephone and Blackberry Policy especially as a high level manager and supervisor within OFMR, certainly undermine our ability to accomplish our mission and your ability to be respected as a supervisor/manager . . . I believe a suspension of [ ] seven (7) calendar days is warranted." (*Id.* at 4).

On May 11, 2007, Winston filed a formal EEO complaint with the Smithsonian alleging discrimination and retaliation by Evans and Bechtol. (Am. Comp. ¶ 16). The Agency rejected his claims and, on August 3, 2007, Winston filed this suit. (*Id.* at ¶¶ 18-19; Dkt. No. 1). He filed an Amended Complaint on October 5, 2007, seeking Title VII damages for discrimination based on race and color, retaliation, and a hostile work environment. (Am. Comp. ¶¶ 45-53). The Smithsonian moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or in the alternative, for summary judgment pursuant to Federal Rule 56. (Dkt. No. 10). Judge Roberts, the District Court Judge previously assigned to this case, granted in part and denied in part the Smithsonian's motion. Judge Roberts determined that Winston had failed to exhaust his administrative remedies as to his discrimination claim based on allegations arising out of his transfer to the Suitland Zone, but otherwise adequately alleged claims of "discrimination and retaliation regarding [Winston's] seven-day suspen-

sion, and of a hostile work environment." (Dkt. No. 21 at 26).

The parties proceeded to the discovery phase of this litigation, and on May 23, 2011, the Smithsonian moved for summary judgment. (Mot. at 1). Winston timely filed his opposition to the motion. (Opp. at 1). The case was reassigned to this District Court Judge on November 5, 2012. (Dkt. No. 44). The matter is now ripe for review.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the nonmoving party. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Count I—Discrimination

Winston alleges that his seven-day suspension was unlawfully motivated by the Smithsonian's discriminatory animus—in other words, the Smithsonian imposed the seven-day suspension because he is African-American. (Am. Comp. at ¶ 46).[2] Generally, to prevail on a claim of discrimination under Title VII, an employee must follow the *McDonnell Douglas* three-part burden-shifting analysis. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C.Cir.2003). The Supreme Court explained the analysis as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection".... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its

**2.** It appears that Winston may also be arguing that the proposed one-day suspension after the Gastlight incident and his subsequent transfer to the Suitland Zone were discriminatorily motivated. (Am. Comp. at ¶ 46). To the extent that Winston is making these claims, they are barred. As discussed earlier in this order, Judge Roberts determined that

Winston failed to exhaust his administrative remedies with respect to his discrimination claim that is derived from these events. (Dkt. No. 21 at 17; Opp. at 39 (conceding this point)). Accordingly, the seven-day suspension is the only viable basis for the discrimination claim.

true reasons, but were a pretext for discrimination.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal citations omitted) (*quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

 To establish a prima facie case of race discrimination under Title VII, an employee must show: (1) that he is a member of a protected class; (2) that he suffered an adverse personnel action; and (3) the unfavorable action gives rise to an inference of discrimination. *Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO,* 548 F.3d 137, 144 (D.C.Cir.2008). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the employee establishes his prima facie case, a presumption then arises that his employer unlawfully discriminated against him. *Id.* at 254, 101 S.Ct. 1089. To rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for its action. *Id.* The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, "[t]he [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089) (internal quotations omitted, emphasis in original).

 If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Lathram,* 336 F.3d at 1088 (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives,* 520 F.3d 490, 494 (D.C.Cir. 2008). At the motion for summary judgment stage, a court need only ask whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of race. *Brady,* 520 F.3d at 494. The court must consider whether the jury could infer discrimination from (1) the prima facie case, (2) any evidence the employee presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the employee. *Waterhouse v. District of Columbia,* 298 F.3d 989, 992–93 (D.C.Cir. 2002) (*quoting Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1289 (D.C.Cir. 1998)). The employee need not present evidence in each of these categories in order to avoid summary judgment. *Aka,* 156 F.3d at 1289. Rather, a court should assess the employee's challenge to the employer's explanation in light of the totality of the circumstances of the case. *Id.* at 1291.

Here, the Smithsonian does not challenge whether Winston has established a prima facie case for discrimination; rather, it offers legitimate, non-discriminatory reasons for the seven-day suspension. (Mot. at 10). The Smithsonian contends that Winston was disciplined because he disobeyed his supervisor's instructions related to the snow removal and because he used an excessive amount of minutes on his work-

issued cell phone for personal phone calls. (Mot. at 1). In support of this, the Smithsonian introduces admissible evidence in the form of affidavits, exhibits, and deposition testimony from the parties involved in each incident. (*See, e.g.,* Def.'s Ex. 21 (the Decision to Suspend Tommy Winston dated April 24, 2007); Def.'s Ex. 22 (The Proposal to Suspend Tommy Winston dated February 28, 2007); Def.'s Ex. 15 (E-mail exchange between Bechtol and Gastright dated February 7-8, 2007 discussing Winston's cell phone usage and how it compares to that of other employees); Def.'s Ex. 48 (E-mail from Evans to Bechtol dated February 8, 2007 discussing the snow removal incident); Def.'s Ex. 49 (EEO Affidavit of Nancy Bechtol dated August 1, 2007 discussing her motivation for suspending Winston); Def.'s Ex. 13 (EEO Affidavit of David Sidbury dated July 19, 2007 discussing the snow removal incident)). This evidence, if believed by the trier of fact, would support a finding that discrimination was not the basis for the seven-day suspension. *See, Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (stating that the employer need not persuade the court that it was actually motivated by the proffered reasons, rather the employee must introduce evidence, which if believed by the trier of fact, would support a finding that the employer's action was discriminatorily motivated).

■ Therefore, it is now this Court's task to determine whether Winston "has produced sufficient evidence for a reasonable jury to find that [the Smithsonian's] asserted nondiscriminatory reason[s] [were] not the actual reason[s]" for his suspension, but rather, it "intentionally discriminated against [him] on the basis" of race and/or color. *Brady,* 520 F.3d at

494. In making this determination, this Court must assess Winston's challenge to the Smithsonian's explanation in light of the totality of the circumstances of the case. *Aka,* 156 F.3d at 1291.

Winston attempts to discredit the Smithsonian's proffered reasoning as pretextual by offering the following. As to the snow removal issue, Winston points out that he was not in charge of snow removal on February 7, 2007, and instead, Evans placed Sidbury in charge. (Opp. at 19; Pl.'s Ex. 6 (transcript of Evans' deposition) at 69: 15-16 ("Q. Who was in charge of snow removal efforts? A. At that time Dave Sidbury")); Pl.'s Ex. 38 at 2)). Winston claims that he "did not authorize, nor was he even aware that Sidbury had called Waters in to assist" on the morning of February 7. (Opp. at 19). In support of this, Winston introduces the ROI Affidavit that a fellow employee, James Culter, gave in relation to Winston's EEO claim in which Culter stated: "I know [Winston] was not in-charge of the snow removal and he said that he did not know that [Waters] was called to come in." (Pl.'s Ex. 38 at 3).[3]

He also argues that the Smithsonian's claim that Evans did not want Waters to participate in the snow removal because he is a WG-10 employee is objectively false. He points to Waters' declaration in which Waters states that he has assisted with snow removal since February 7, 2007 on "numerous" occasions. (Pl.'s Ex. 43). Winston also points to Sidbury's affidavit in which Sidbury alleges that he told Evans that "if Waters [comes] in, he [is] not going to send him home," and Evans responded, "Okay." Winston claims that this shows that the Smithsonian really did not care if Waters worked snow-removal duty on February 7. (Opp. at 19). Lastly, Win-

---

**3.** Mr. Culter, Winston's subordinate, also attended the February 6 manager's meeting.

(*Id.* at 2).

ston contends that the fact that Sidbury was not disciplined for disobeying Evans' instructions is further evidence that the snow removal was just pretext for the Smithsonian's true discriminatory intent.

As for the cell phone issue, Winston asserts that Bechtol, the Deciding Officer who imposed the seven-day suspension, was aware that there were other supervisors like him who "abused their cell phone" yet those individuals were not disciplined. (Opp. at 23 (noting that Pat Smith, a Smithsonian employee, used over 6,000 minutes in one month)). He charges that none of these individuals was disciplined even though the Smithsonian has "a mandatory disciplinary action...for *any* employee who was over 2,000 minutes on his cell." (*Id.* at 28) (emphasis in original). Winston claims that this is in direct contrast to how he was treated, asserting that "[a]s soon as Bechtol found out that [he] may be abusing his cell phone, her instinct was to discipline him." (*Id.* at 22). He points to an email that Bechtol wrote to Evans the day after she found out about Winston's phone usage. In it she states: "Nothing unexpected. Just keep doing what we need to do. Work today with OPS and OCIO and Melanie [Engelen] on this phone deal and the internet. He might have just made his first major mistake." (Def.'s Ex. 48). He also argues that Bechtol was concerned that Winston would find out about the other supervisors' cell phone usage. (Opp. at 24). Again, he cites to another email written by Bechtol, this time to Engelen:

I have not given this to anyone else yet...but I wanted to get this to you so you can see that I have several others (and some are supervisors) who also appear to be abusing their cell phones....I just wanted you to be aware though, that there are others as it appears, and will handle these guys in a similar fashion. Of note David

Sidbury at CRC in Suitland is Tommy Winston's Assistant Building Manager and he appears to have very similar minutes of phone use. ...Not sure Tommy would know of his phone use or not, but he might bring it up. He is also very friendly with Robert Lane and Ed Tyson and they also appear to be high on minutes too. So, the plot thickens. ...Please keep this close to the vest till we learn more. Thanks, Nancy

(Def.'s Ex. 52). This email was written on March 6, 2007, approximately three weeks before Bechtol issued the Decision on the Proposal to Suspend. (*Id.*). Thereafter, on March 15, 2007, Bechtol again wrote Engelen:

Looks like I have five folks in OFMR who have clocked over 2000 minutes per month on their government cell phones. They are Pat Smith ...Winston ... Sidbury ... Anthony Robinson ... and John Lagundo. All five of these guys are supervisors, with [Winston] and [Lagundo] being GS-13s. [Lagundo] is a new employee just hired about 6 months ago. What is your recommendation on how to handle this Mel? I am not sure what to do here.

(Def.'s Ex. 53). Engelen responded by asking Bechtol whether it was possible to confirm that the phone calls were personal in nature. (*Id.*). When Bechtol responded that it was, Engelen stated: "Good then we can determine next steps. We have to do something because of [Winston]. We can talk." (*Id.*).

Winston focuses on John Lagundo, in particular, who, like Winston, was a GS-13 Building Manager with Bechtol as his second-line supervisor, and who averaged 2,000 minutes of usage. (*Id.* at 28–29). Winston submits an affidavit from Lagundo in

which Lagundo states that he was not disciplined for his cell phone usage. (Pl.'s Ex. 56). Winston alleges, without submitting proof, that Lagundo is Caucasian. (Opp. at 29).[4] He contends that the Smithsonian's disparate treatment of Lagundo is sufficient evidence to raise a reasonable inference of discriminatory intent. (*Id.* at 29).

Lastly, Winston claims that the emails exchanged between Bechtol, Evans, and Engelen regarding the proposed seven-day suspension evidence the fact that the discipline was motivated by discrimination. For instance, he points to Bechtol's April 4, 2007 email to Engelen in which she states:

> Attached is my first draft of the Winston decision. I have given it my best shot. I spoke to [Evans] about each of the issues raised [in Winston's attorney's letter objecting to the suspension] and they are indeed bogus in every way. See what you think. I will leave it up to you and Dolph to decide whether these actions support 7 days or not. I want some sort of suspension, though, as this guy has to stop defying orders.

(Def.'s Ex. 25). Winston claims that this email and others like it evidence "an appalling campaign of discrimination" against him. (Opp. at 1).[5]

The Court finds that Winston has not produced sufficient evidence for a reasonable jury to find that the Smithsonian's asserted non-discriminatory reasons for disciplining Winston were not the actual reason, and instead, the Smithsonian intentionally discriminated against Winston on the basis of race and/or color. *Brady*, 520 F.3d 494. To begin, the emails that Winston cites to as evidence that Bechtol conducted "an appalling campaign of discrimination" against him actually demonstrate otherwise. For instance, while Bechtol's March 6, 2007 email may suggest that she is concerned that Winston will discover that other supervisors have high cell phone minute usage, she also states that she "will handle these guys in a similar fashion." (Def.'s Ex. 52). Likewise, the April 4, 2007 email states that Bechtol would like to suspend Winston, but "will leave it up to [HR] to decide whether these actions support 7 days or not." (Def.'s Ex. 25). She further states that the reason for the requested suspension is to stop Winston from "defying orders." (*Id.*). These emails, read as a whole and within the context of this case, simply do not evidence that Bechtol was motivated by discriminatory animus when she issued the seven-day suspension.

Moreover, Winston cannot establish that he was treated differently from a similarly situated employee who is not part of his protected class. To prove that he is similarly situated to another employee, Winston must "demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [allegedly comparable]' employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C.Cir.1995) (internal citation and quotation marks omitted)). Here, Winston points to the fact that Sidbury was not disciplined

---

4. The Smithsonian does not dispute that Lagundo is Caucasian; rather, it argues that Winston has not submitted evidence of Lagundo's ethnicity. (Reply at 11).

5. Winston also claims that at least some of the personal calls were related to his military service. Because he raises this argument for the first time in the Opposition to the Motion, the Court will disregard it. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C.Cir.2004) (noting that it is a "hard and fast rule of administrative law" that "issues not raised before an agency are waived and will not be considered by a court on review").

when he called Waters in to help with the snow removal as evidence of disparate treatment. This argument fails for a number of reasons. First, Sidbury is African-American. Management treating another African-American employee in the same Zone more favorably then Winston seriously undermines his race discrimination case. *See, e.g., Murray v. Gilmore*, 406 F.3d 708, 715 (D.C.Cir.2005) (affirming the dismissal of a race discrimination claim because even assuming the defendant's justifications were pretext, "a replacement within the same protected class cuts strongly against any inference of discrimination") (citing *Brown v. Brody*, 199 F.3d 446, 451 (D.C.Cir.1999)); *Holmes–Martin v. Sebelius*, 693 F.Supp.2d 141, 159 (D.D.C. 2010) (noting that any inference of discriminatory motive is severely undermined by the fact that employer transferred work duties to another employee within the same protected class); *Udoh v. Trade Center Management Assoc.*, 479 F.Supp.2d 60, 66–67 (D.D.C.2007) (evidence that another employee in the same protected class was treated more favorably than plaintiff buttressed employer's contention that termination was not based on discrimination).

Second, Sidbury and Winston are not similarly situated. Winston is the Building Manager; Sidbury is his assistant. As Sidbury stated in his declaration, when he told Evans that he would not send Waters away if he came in for the snow removal on February 7, Evans consented because it was not Sidbury's job to ensure that Waters did not come in; it was "Winston's job to tell [Waters]" not to come in because "[Winston] was [Waters'] supervisor." (Pl.'s Ex. 39 at 3). Third, Bechtol highlighted the significance of this distinction in her decision to suspend Winston: "As a Build-

ing Manager, you have subordinates supervisors who work for you, and they provide direction to their staff. Your task was to make sure that the Assistant Building Manager, your subordinate, did not call [Waters] in to work on snow removal on February 7." (Pl.'s Ex. 21).

Furthermore, the fact that Waters was called in to work snow removals subsequent to February 7 does not tend to show that the Smithsonian's proffered reason for the seven-day suspension was pretext. While it may call into question Evans' reason for not wanting Waters to work the snow removal on February 7, it does not call into question the Smithsonian's reason for disciplining Winston (*i.e.* disregarding Evans' instructions).

Nor has Winston produced evidence sufficient for a reasonable jury to find that the discipline surrounding his cell phone usage was racially motivated. Winston alleges that another supervisor, Pat Smith, used over 6,000 minutes on her phone and she was not disciplined for excessive use. (Pl.'s Ex. 4 234:9-11). The Smithsonian counters that Ms. Smith is the Smithsonian's Special Events Coordinator, and all of Smith's minutes were work-related (*e.g.* contact caterers and such). (*Id.* at 235:1-10). Winston also alleges that Mr. Lagundo was not disciplined for his excessive cell phone use. (PSMAF at ¶¶ 128-130). Winston cannot establish that Lagundo is similarly situated to him with respect to the cell phone issue. Lagundo worked in a different zone, had a different manager, had significantly less experience at the Smithsonian,[6] and testified that "[n]ot all but most were work related."[7] (Pl.'s Ex. 56). Moreover, Lagundo did not have a disciplinary action already underway for

---

**6.** Lagundo had a year's experience at the Smithsonian to Winston's twelve.

**7.** It is significant that, unlike Lagundo, Winston does not allege how many, if any, of the 2,000 minutes were work related.

other misconduct as Winston did. *See Childs–Pierce v. Util. Workers Union of Am.*, 383 F.Supp.2d 60, 70 (D.D.C.2005) (quoting *Phillips v. Holladay Property Serv.*, 937 F.Supp. 32, 37 (D.D.C.1996) (comparators "must have dealt with the same supervisor, have been subject to the same standard and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").[8]

■ Finally, the remainder of Winston's arguments can be characterized as arguing that it was "wrong" or "unfair" to discipline him. He argues that he was not responsible for the snow removal on February 7 and that he did not know that Sidbury called Waters in to work that day. Essentially, he is arguing that it is not fair to discipline him for his subordinate's actions. It is hornbook law that it is not enough for an employee to demonstrate that the employer's reasoning was wrong or unjustified; rather, the employee must present "enough evidence for a reasonable jury to consider the employer's reasoning to be subterfuge." *Burke v. Inter–Con Sec. Systems, Inc.*, 926 F.Supp.2d 352, 363 (D.D.C.2013). This is because while "many bosses are harsh, unjust and rude," Title VII only protects against invidious discrimination. *Bryant v. Brownlee*, 265 F.Supp.2d 52, 63 (D.D.C.2003); *see also, Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986) ("a district judge does not sit as 'super-personnel department

that reexamines and entity's business decisions' ").

Simply put, "despite hundreds—if not thousands—of e-mail messages produced in discovery, 8 depositions, and at least 11 affidavits, Winston cannot identify evidence" sufficient for a reasonable jury to infer that the seven-day suspension was racially motivated.

### C. Count 2—Retaliation

■ Winston also argues that his seven-day suspension was motivated by retaliatory animus. Specifically, he alleges that Bechtol suspended him in retaliation for his June 26, 2006 EEO complaint relating to his transfer from the East Mall Zone to the Suitland Zone. (Opp. at 24).

■ The *McDonnell Douglas* burden-shifting framework also governs claims of unlawful retaliation. *Taylor v. Solis*, 571 F.3d 1313, 1320 n. * (D.C.Cir. 2009). To establish a prima facie case of retaliation, an employee must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C.Cir. 2009). The employee's burden is not great; he "need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C.Cir.2001) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984)).

Here, the Smithsonian alleges that Winston cannot establish a prima facie case of

---

8. Winston alleges that the Smithsonian purposefully grouped the two incidents together in order to defeat the possibility that he would be able to establish that he was treated differently from a similarly situated coworker. (Opp. at 30). However, he presented no evidence that Bechtol or anyone else involved

had such nefarious aims. To the contrary, Smithsonian management became aware of the both incidents on the same day. It was entirely reasonably of them to group both events into a single disciplinary proceeding in the interest of efficiency.

retaliation because he cannot show that a "causal connection" exists between the seven-day suspension and his June 26, 2006 EEO complaint. (Mot. at 16). Winston first contacted an EEO counselor on April 27, 2006, and he filed his formal EEO complaint on June 26, 2006. (Am. Comp. at ¶¶ 5-6). More than seven months elapsed between the formal complaint and February 7, 2006, when Evans first considered reprimanding Winston for the snow removal issue. (Def.'s Ex. 15 at 2). More than nine months elapsed between the EEO complaint and Bechtol's Decision to Suspend for Seven Days. (Am. Comp. at ¶ 43).

Winston counters that when an employer retaliates at the first opportunity that is presented, an employee is not foreclosed from making a prima facie case despite a substantial gap in time. (Opp. at 25 citing *Barnabas v. Univ. of the D.C.*, 686 F.Supp.2d 95, 105 (D.D.C.2010). Winston claims that the Smithsonian's first opportunity to retaliate against him subsequent to the June 26, 2006 EEO filing came on February 8, 2007, when the issue of Winston's abuse of the cell phone presented Bechtol with the first opportunity to retaliate against him. (Opp. at 25).

 The Court questions whether, under the circumstances of this case, a

reasonable jury could conclude that Winston suffered a materially adverse action by the Smithsonian.[9] It is true that "some actions not sufficiently adverse under a [discrimination] theory may sustain a retaliation claim," *Manuel v. Potter*, 685 F.Supp.2d 46, 66 (D.D.C.2010) (citations omitted), but as with discrimination claims, not every bad act suffered by an employee is sufficient. *Hunter v. D.C.*, 905 F.Supp.2d 364 (D.D.C.2012). The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). To support a claim for retaliation, an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* An objective, "reasonable person" standard applies. *Id.* "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.*

Here, Winston was reinstated into exactly the same position that he was in before the suspension. There is no evidence that his duties, responsibilities, pay grade, or chances of promotion changed as a result of the suspension. What is more, the

9. This Circuit suggested in *Brady* that an employer may be foreclosed from attacking the sufficiency of a plaintiff's prima facie case if the employer asserts a legitimate, nondiscriminatory reason for its employment action, 520 F.3d at 493–94 (noting that "once the employer asserts a legitimate, nondiscriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' " and instructing the district court not to analyze whether the plaintiff has made out a prima facie case once the employer articulates a legitimate, nondiscriminatory reason for the adverse action) (quoting *Hicks*, 509 U.S. at 510, 113 S.Ct. 2742, as courts in this Circuit have noted since *Brady*, this is not always the case. *See Bright v. Copps*, 828 F.Supp.2d 130, 147 n. 9 (D.D.C.2011) (citing

*Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1343 (D.C.Cir.2008) (explaining that because the defendant argued that the challenged action was not materially adverse and also proffered a legitimate reason for the action, "[w]e analyze first whether the [action] was a sufficiently adverse action to support a claim under Title VII [and] then consider whether the [plaintiffs] have adduced sufficient evidence of discrimination to put their case before a jury"); *Adesalu v. Copps*, 606 F.Supp.2d 97, 103 (D.D.C.2009) (noting that "[w]hile *Brady* directs the district court's focus to the employer's proffered non-discriminatory reason, the Court still first must determine whether plaintiff has suffered an adverse employment action")).

Smithsonian alleges that Winston was paid during the suspension, an allegation that Winston does not dispute. (*See* Mot. at 5 noting that Winston continued drawing a salary from the U.S. Treasury because he performed Air National Guard duties during the suspension). Paid suspension alone is not enough to rise to the level of materially adverse unless it causes some further harm or hardship. *Hunter*, 905 F.Supp.2d at 378.

Nevertheless, even if this Court were to find that the seven-day suspension constituted a materially adverse action, Winston cannot establish a causal link between his 2006 EEO activity and his 2007 suspension. An employee may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] action took place *shortly* after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985) (emphasis added); *see also, Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that the temporal proximity between employer's knowledge of protected activity and an adverse employment action must be "very close" to be sufficient evidence of a causal connection). Courts in this District have held that a gap of even two months is too remote to infer any casual connection. *See Baker v. Potter*, 294 F.Supp.2d 33, 41 (D.D.C.2003) (two-month gap between protected activity and adverse employment action insufficient to demonstrate temporal proximity to establish a casual connection); *see also, Mayers v. Laborers' Health & Safety Fund of North America*, 478 F.3d 364, 369 (D.C.Cir.2007) (Eight or nine month gap "far too long" to establish causal link); *Nagpal v. Holder*, 750 F.Supp.2d 20 (D.D.C.2010) ("four month gap between protected activity and the adverse employment action lacks the temporal proximity

necessary to establish a casual connection" in this Circuit).

Here, more than nine months passed between Winston's first EEO complaint and Bechtol's decision to suspend him. This is simply too remote to establish a casual connection between the two. What is more, contrary to Winston's argument that the seven-day suspension was Bechtol's first opportunity to retaliate against him, Bechtol treated Winston favorably in the face of multiple opportunities to exercise retaliatory discretion over him between his EEO complaint and the seven-day suspension. During this time, Bechtol selected Winston to be the Building Manager in the Suitland Zone. When describing his interview for the position to Evans in an email, Bechtol explained that "[Winston] did just fine...I think the sky is the limit for him" and suggested that Evans assign him more substantive work. (Pl.'s Ex. 33). In addition, Bechtol signed off on a favorable performance evaluation, a cash award, and a time-off award, and she approved his request to travel to an industry conference at an expense rate above *per diem*. (Def.'s Exs. 29, 35-38). These intervening events greatly undermine the inference of retaliation. *See, e.g., Johnson v. Auburn Univ.*, 403 F.Supp.2d 1101, 1114 (M.D.Ala.2005), *aff'd*, 193 Fed.Appx. 955 (11th Cir.2006).

Considering the totality of the circumstances, including the nine month period between Winston's EEO complaint and his suspension, as well as his intervening promotion, positive review, and various discretionary awards, Winston has failed to present sufficient evidence for a reasonable jury to find a causal link between his protected act and the adverse employment action. Likewise, as discussed *supra*, no reasonable jury could find that Smithsonian's proffered reasons for the seven-day suspension were pretextual. *See Laurent v.*

*Bureau of Rehab., Inc.*, 544 F.Supp.2d 17, 23 n. 5 (D.D.C.2008) (holding that plaintiff cannot establish pretext because she "is unable to show any causal connection" her complaints and the adverse action). Accordingly, Count II must be dismissed.

### D. Count III—Hostile Work Environment

 Finally, Winston alleges that the Smithsonian subjected him to a hostile work environment. To prevail on such a claim, a plaintiff must show that his employer subjected him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also Barbour v. Browner*, 181 F.3d 1342, 1347–48 (D.C.Cir. 1999). On the other hand, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII's purview." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Winston points to six incidents to establish his hostile work environment claim: (1) a conversation with David Samec, his East Mall Supervisor, in which Samec allegedly told him that his co-worker, Kendra Gastright, accused him of threatening her with physical violence during the January 13, 2006; (2) his removal from the East Mall Zone and the resulting humiliation; (3) his reassignment to the Suitland Zone, where he was initially given a smaller office and reduced work responsibilities; (4) Samec's proposal to suspend him for one day; (5) Evans' proposal to suspend him for seven days; and (6) Bechtol's decision to suspend him. (Am. Comp. ¶¶ 22–25, 32–34, 45; Opp. at 7, 11). Winston alleges that his transfer from the East Mall Zone to the Suitland Zone was motivated by his race as, Gastright, an Asian-American, was only required to write a letter of apology despite the fact that she used profanity and abusive behavior during the January 13 meeting. Furthermore, Winston alleges, once in the Suitland Zone, he continued to face a hostile work environment. In Winston's view, Bechtol, a Caucasian, was the driving force behind his poor treatment.

The Smithsonian counters that Winston's hostile work environment claim fails because it merely reframes the same events that make up his discrimination and retaliation claims rather than creating a distinct hostile work environment claim. (Mot. at 23). The Smithsonian also argues that the actions Winston relies on are insufficiently pervasive or severe to establish a hostile work environment claim. (*Id.* at 24). Finally, the Smithsonian argues that even if the events were sufficiently severe and pervasive to establish such a claim, the claim nevertheless fails because he cannot attribute his treatment to his protected status.[10] (*Id.* at 26).

---

**10.** The Smithsonian also argues that Winston cannot rely on the events that occurred in the East Mall Zone because they are time-barred. (Mot. at 20). Because the Court can resolve this claim on other grounds, it will not address this argument.

Winston has failed to show that the Smithsonian subjected him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work place". *Harris*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295. When the Court considers the totality of the evidence proffered, and draws all reasonable inferences in favor of Winston, there are no genuine issues of fact, and no reasonable jury could find that Winston established a hostile work environment claim. Simply put, Winston "cannot meet the high burden of showing hostility in the work environment" at the Smithsonian that was "severe," "pervasive," and "abusive."

First, the conduct was not sufficiently frequent. Essentially, Winston complains of two disciplinary actions and their direct consequences that took place over the span of fifteen months. Two discrete incidents and several conversations and written reprimands that resulted are hardly frequent enough to establish a workplace permeated with discriminatory intimidation, ridicule, and insult. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C.Cir.2008) (employee's claim "undermined by the sporadic nature of conflicts"); *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.Cir.2002) ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment"). Moreover, while Winston argues that his transfer from the East Mall Zone to the Suitland Zone was unfair and that the seven-day suspension was unjustified, he does not suggest that Samec, Evans, or Bechtol treated him in a threatening, degrading, or offensive manner. To the con-

trary, a significant portion of Winston's interactions with his supervisors was recorded in writing, and nothing in that correspondence appears anything but civil. Nor does Winston present any evidence that the alleged mistreatment interfered with his work performance. Finally, Winston has not put forth any evidence tying the events to his protected status. *See Singh v. U.S. House of Representatives*, 300 F.Supp.2d 48, 56 (D.D.C.2004) (quoting *Lester v. Natsios*, 290 F.Supp.2d 11, 22 (D.D.C.2003)) ("[I]t must be clear that the hostile work environment was the result of discrimination based on a protected status...[o]therwise, the federal courts will become a court of personnel appeals") (internal citation omitted).

Given the totality of the circumstances, the Court finds that no reasonable jury could find that Winston was subjected to a hostile work environment.

## IV. CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS Defendant's Motion for Summary Judgment. Plaintiff's claims are DISMISSED with prejudice.